Davis, J.,
delivered the opinion of the court:
This case was first heard at the December term, 1879 (15 C. Cls. R., 414). The claimant, being dissatisfied with the judgment then rendered, and having discovered new evidence, asked for a rehearing. The exhaustive argument of the junior counsel for the claimant on the facts as now presented, and the comprehensive and able exposition of the law by the senior counsel, leave the court no room for misunderstanding his theory of his case in both branches.
I. A question of jurisdiction arises at the threshold with regard to a large portion of the claim. The cl.iims come here from the Department of War, by virtne of a letter from the Secretary of War, transmitting them to this court for adjudication under the statute. As some question was made at the argument as to the cause of the transmission, it may be as well to insert the Secretary’s letter textnally in this opinion:
“WAR DEPARTMENT,
“ Washington City, October 13, 1873.
“To the honorable Judg-es op the Court op Claims:
“The undersigned, Secretary for the Department of War of the United States, hereby represents that a claim has been made upon said department by Henry B. Ward, assignee of Simeon Hart, for payment for supplies furnished the Quartermaster and Commissary Departments, under contract.
“This claim involves disputed facts and controverted questions of law, and the amount in controversy exceeds $3,000, and it is therefore deemed proper to transmit the claim, with all the vouchers, papers, proofs, and documents pertaining thereto, on file in this department, to the Court of Claims, to be there proceeded in according to law.
“Wi. W. Belknap,

1 “Secretary of War?

It .appears by the petition that a large part of the demands sued for in this action accrued prior to April 13, 1861. In his fifth request for findings, the claimant asks us to find that “on the 3d day of March, 1861, Simeon Hart, the claimant’s intes *481 tate, was residing in El Paso, Texas, and was in active sympathy with those who were inciting to rebellion”; and that “in April, 1861, he joined the insurgents, and then, and afterwards, furnished them with supplies, money, and means of transportation to carry on their invasion and camjiaign into New Mexico.”
The joint resolution of Congress of March 2, 1867, which is embodied in the Revised Statutes as section 3480, enacts as follows:
“That until otherwise ordered it shall be unlawful for any officer of the United States Government to pay any account, claim, or demand against said government which accrued or existed prior to the 13th day April, A. D. 1861, in favor of any person who promoted, encouraged, or in any manner sustained the late rebellion; or in favor of any person who, during said rebellion, was not known to be opposed thereto, and distinctly in favor of its suppression; and no pardon heretofore granted or hereafter to be granted shall authorize the payment of such account, claim, or demand until this resolution is modified or repealed: Provided, That this resolution shall not be construed to prohibit the payment of claims founded upon contracts made by any of the departments where such claims were assigned or contracted to be assigned prior to April 1, 1861, to creditors of said contractors, loyal citizens of loyal States, in payment of debts incurred prior to March 1, 1861.”
It is plain from the pleadings that so far as the date is concerned most of thé demands in suit come within this act. It is also clear, from the claimant’s request, that his intestate was one of the persons to whom the act forbids payments to be made. The provisions of this act, so far as they have any force, clearly apply to such demands, unless they are taken out from it by some other act.
The claimant asks us to find that on the 4th of November, 1865, his intestate received a full pardon, and he maintains that it operated to set aside the provisions of this act as to him and his claims. We cannot concur in this view. It seems to ns that it rests upon a radical error as to Hart’s status in the executive departments and in this court, after the close of the war.
The facts stated in the claimant’s request show that Hart was guilty of levying war against the United States, of adhering to their enemies, and of giving them aid and comfort within the United States. For these acts he was liable on proper convic *482 tion to the punishments provided by the first section of the Act April SO, 1790 (1 Stat. L., 112). It also shows that he committed the crime of treason against the United States, and became liable on proper conviction to one of the punishments provided by sections 1 and 3 of the Act July 17, 1802 (12 Stat. L., 589). It also shows that he was guilty of the offense of inciting, setting on foot, assisting, or engaging in the rebellion, and of giving aid or comfort thereto, and became liable, on proper conviction, to the punishments provided by sections 2 and 3 of the last-named act (ib., 590). It also shows a state of things which authorized the seizure of his property, including the.demands now in suit, and its confiscation by means of judicial proceedings instituted for that purpose, under the provisions of sections 5, 6, and 7 of the last-named act (ib., 590, 591).
The close of the war left Hart liable to be proceeded against for any or all these offenses against the statutes of the United States, and to be punished for each or all when convicted, and liable to the confiscation of his property. From all that liability the President’s pardon of November 9, 1865, completely exempted him.
So, too, in order to authorize this court to render a judgment in his favor, it was necessary that he should set forth in his petition that he had at all times borne true allegiance to the Government of the United States, and that he had not in any way voluntarily aided, abetted, or given encouragement to the rebellion; and the government could traverse this, and if on the trial the issue should be decided against him, his petition would be dismissed (Act of March 3, 1863, § 12). And in proceedings under the captured and abandoned property act he was obliged to prove, affirmatively, that he had never given aid or comfort to the rebellion (Act of March 12, 1863, § 3). From the effect of these statutory provisions also the pardon relieved him.
But disability to receive debts due to him, whether from individuals or the United States, was not made a consequence of any offense. So far as' his relations with the United States were concerned, Hart had, at the time of the receipt of his pardon, or at the time of the passage of the joint resolution of March 2,1867, committed' no offense which took away from him the right to be paid at the Treasury any sums of money due to *483 him by the United States, for which no proceedings for confiscation had been instituted. It is therefore clear that there ■was no disability of this kind for the pardon to operate on when it was granted.
Hart’s disabilities did not grow out of treasonable acts for which, so far as appears, he was never indicted; but from another and quite different relation which he bore to the United States — that of a public enemy. Before the war he could make a valid contract with the government, could fulfill that contract, and could earn the right to the compensation provided for its fulfillment. The war converted him into a public enemy irrespective of his individual acts. During its existence he could not contract with inferior government officials, could not earn compensation on such contracts, and could not receive payment for services. When the war closed he reverted to his original status. He could contract anew with the government, could receive pay under the new contract, and could receive pay earned under an old contract prior to the war, provided it had not been paid or confiscated. He needed no pardon to enable him to do this.
As the President’s pardons conferred no increased right upon Hart to obtain pay under the old contracts, so the resolution of March 2, 1867, took nothing from him which had been conferred by the pardons. It impinged upon no function intrusted by the Constitution to the Executive. It did not, like the legislation which was reviewed in Klein’s Oase (13 Wall., 128), attempt to prescribe to the judiciary the effect to be given to an act of pardon or amnesty by the President. Congress simply forbade claims of this class to be paid until it should otherwise order.
The claimant contends that this cannot be done, because it practically leaves him without a remedy. This position is entirely untenable. The only remedy which the Constitution provides for a claimant against the government is in Congress. It says, “No money shall be drawn from the Treasury but in consequence of appropriations made by law.” It provides for the distribution of work in carrying on the government in executive departments. It contemplates the passage of general laws providing machinery for doing this work. Such departments have been organized, and such legislation has been had and is constantly going on. Congress provides for the payment of *484 the work which it thus authorizes by general appropriations, and it directs by general legislation what officers shall audit accounts presented for payment under general appropriations, and what officers shall authorize their payment. It delegates a portion of its power to this court, and authorizes judgments to be rendered by it which shall be respected at the Treasury. All these provisions are wise ; but we. entertain no doubt that the same power which created them can abrogate them; that it can deny to the court and the department the right to pass upon and pay any class of claims; still further, that it can refuse to appropriate for any or all classes of claims. The absolute control of the moneys of the Hnited States is in Congress, and Congress is responsible for its exercise of this great power only to the people. As we said in our former opinion, It is entirely within the power of Congress to indicate a class of persons who shall not be paid out of general appropriations, but shall come to Congress for relief.”
Congress having, in the exercise of a clear constitutional right, provided that claimants like Hart should not be paid from general appropriations for claims that accrued prior to April Í3, 1861, the Executive was powerless to consider such claims. Auditing and accounting are but parts of a scheme for payment; and, in our opinion, the arrest of the object was the arrest of the means for obtaining it.
The act of 1868 was strictly auxilary, for the purpose of assisting heads of departments in investigating and disposing of ordinary claims against the government. It conferred on claimants no rights or remedy which did not previously exist. If the resolution of 1867 deprived claimants of the right to receive pay, the subsequent act did not restore that right. On the contrary, it expressly restricted the reference of claims to the classes of which the court already had jurisdiction. It would be an abuse of construction to extend the right to specific classes of claims which Congress had carved out of the mass and reserved in terms for future legislation. Should the head of a department be in doubt (as was the case in PaddforWs Case, 9 Wall., 531) whether a claimant comes within the excluded class, he may refer the case to this court. It would then become our duty to take jurisdiction; but as soon as the fact is ascertained that the claim is within the prohibition of the resolution of 1867, the court must say that, being a claim which the Executive *485 was forbidden to pay, its reference does not confer jurisdiction to proceed with it to final judgment. With this modification, induced by the recent argument, we repeat the former expression of our views:
“ That would be making the Treasury do indirectly what Congress has said it cannot do directly. Were we to render judgment in the claimant’s favor on such claims we should invite the officers of the Treasury to do an act, under cover of our judgment, which Congress plainly intended that they should not have authority to do in any contingency. We are not required to determine whether we should be authorized to render judgment against the government on this class of claims if the claimant had appeared here on his own motion. We confine ourselves to this: that when the head of an executive department is forbidden by law to pay a claim, there can arise no disputed fact, no controverted question of law, nothing in which our decision can affect a class of cases, nothing in which it can furnish a precedent for the future action of an executive department, nothing in which any authority, right, privilege, or exemption can be claimed or denied under the Constitution of the United States, to warrant the transmission of the claim to this court, or to confer upon this court a jurisdiction, derived through the department, which is expressly denied to the department. The duty of the executive officer is to deny the claim irrespective of all such considerations. He has no power to assist the claimant to any other remedies.”
The claimant’s counsel, in answer to this, ingeniously contends that the effect of the President’s pardon-is a constitutional question. The act authorizing the Executive to transmit claims here provides that it may be done, among other cases, where any authority, right, privilege, or exemption is claimed or denied under the Constitution of the United States. He argues with great vigor that the right of transmission must exist in spite of the resolution of 1867, because the very constitutional question to be tried is raised by that resolution.
The answer to this argument is that the case is not sent here for such a cause or with such an object. The claim is transmitted here under a different and distinct provision of the act, as a claim involving disputed facts and controverted questions of law, in which the amount in controversy exceeds $3,000. No constitutional question was suggested in the Secretary’s letter. None was suggested at the former trial. It is an ingenious afterthought of counsel; but it cannot be raised here by counsel for the purpose of giving us a jurisdiction we should not otherwise *486 bave had. Our jurisdiction in these cases is special; wider than the court enjoys in cases commenced by the voluntary action of claimants, inasmuch as the statute of limitations cannot be interposed; and depends upon the letters transmitting them for its origin. We cannot travel beyond the Secretary’s letter in order to ascertain whether another reason existed which might also have justified him in transmitting the case here. And even if we could, we are all of opinion, as we have already stated, that our jurisdiction ceases when we ascertain that a law enacted within the constitutional power of Congress forbids payment of the claim by the Executive transmitting it. We cannot then proceed to give a judgment which may secure payment of the claim in violation of the act; nor, on the other hand, a judgment which will bar the claimant when the act is repealed. Therefore, as to all the claims prior to April 13, 1861, we decline to take jurisdiction further than to find the facts upon which, taken in connection with the pleadings and request for findings, we rest our disposition of this part of the case.
II. For a proper understanding of the disposal which xve make of the remainder of the case, it will be necessary to refer briefly to some of the principal facts in the findings.
The controversy arises on disputed vouchers for flour supplied to the Subsistence Department, and corn and forage supplied to the Quartermaster’s Department. The two classes of transactions are distinct.
It is claimed that the flour was delivered under three contracts, all of which are set out in the findings. One, of the 28th June, 1860, for 100,000 pounds, and one, of the 3d November, 1860, for 135,000 pounds, were made with Lieut. Thomas B. Jackson, of the Eighth Infantry, who was stationed at Fort Bliss, in the northwest corner of Texas, and acting as assistant commissary of subsistence. They were in the usual form. The third contract, for 263,000 pounds, was made with Col. John B. Gray-son, who was the chief commissary of subsistence at Santa Fé, in New Mexico. It was made at El Paso, in Texas, near Fort Bliss, by means of a letter from Hart, dated November 9, making proposals, and a written indorsement thereon by Grayson, dated November 10, accepting the same.
Jackson and Grayson sympathized with the movement for secession, and went over when the resistance became overt; *487 Jackson intbe latter part of Marcli and Grayson on the 17th. June. Hart, as we have already seen, was also an active sympathizer and participator in the rebellion.
Official documents from executive departments form part of the findings, from which it appears that Jackson certified to the delivery by Hart of flour, as follows:
Pounds.
In New Mexico : September 4, 1860, at Fort Craig... 21, 000
October 8,1860, at Albuquerque. 36, 000
November 15,1860, at Fort Craig. 19, 000
November 15,1860, at Fort Craig... 2,000
November 17, 1860, at Fort Fillmore.. .■. 10,000
January 26, 1861, at Fort Craig. 24,000
January 29, 1861, at Fort Craig.. . 24,000
January 31,1861, at Albuquerque.. 40, 600
February 18, 1861, at Albuquerque. 11,300
In Texas: October 8, 1860, at Fort Bliss. 6,810
November 9, 1860, at Fort Bliss. 4, 000
December 10,1860, at Fort Bliss . 4,102
January 16, 1861, at Fort Bliss. 3,000
February 20, 1861, at Fort Bliss. 4, 000
March 3,1861, at Fort Bliss. 32,000
241, 812
By means of the same documents it appears that Grayson certified to the delivery of flour by Hart, as follows:
Pounds.
The vouchers in WcKnight’s Case (13 O. Ols. R., 292; 98 H. S., 179; Finding XIX)... 154, 996
His provision returns for April.. 49,800
A further amount in his voucher of June 21, 1861, which does not appear in any other voucher. 19, 900
224,696
The United States have paid vouchers for all the flour covered by Jackson’s certificates as above and by Grayson’s certificate in the McKnight case. There is another voucher certified by Jackson for the delivery of 30,000 pounds of flour at Fort Bliss, on the 3d of March, which has not been paid,' and which is now disputed. Adding Grayson’s certificates and Jackson’s certificates paid and unpaid together, we have an aggregate of 496,508 pounds; or so near to the aggregate of 498,000 pounds called for by the three contracts as to raise a strong presump *488 tion in the claimant’s favor, if there were nothing else in the case.
It appears, however, that on the 25th June, 1861, nearly three months after the date of the disputed delivery to Jackson, and several weeks after the last alleged delivery to Grayson, Hart had in his possession at El Paso, within the enemy’s lines, 153,000 pounds of flour,' which he claimed was the property of the United States under the contracts. The conclusion is irresistible that about 150,000 pounds of flour, covered in part by the disputed voucher of Jackson and in part by other vouchers, most or all of which have been paid, never came into the actual possession of the United States. If delivered at all, all this property was delivered constructively, Hart retaining possession of it in the enemy’s country.
The provision returns of Jackson and Grayson show some facts embodied in the findings which fortify these conclusions.. Jackson charges himself with 208,002 pounds of flour bought from Hart. This includes the disputed voucher. In balancing the return he credits himself with 50,600 pounds delivered to the agent of the State of Texas when Fort Bliss was surrendered. But the findings show that the agent of the State of Texas receipted for only 600 pounds. It was pressed upon us that this was a clerical error; but under the circumstances of this case we cannot accept such a theory.
Grayson made returns in January, February, March, and April. His April returns show purchases from Hart to the amount of 49,800 pounds, all of which was delivered at Santa Fé and is accounted for. Of the alleged deliveries in May to the amount of 154,996 pounds, which formed the subject of controversy in the McKuight case, and of the 19,900 pounds included in the voucher of June 21, no return was ever made.
Some other facts in the public history of the time have a bearing upon the disputed voucher of Jackson. On the 18th February, 1861, Major-General Twiggs issued an order for the evacuation of all the military posts in Texas, and required the troops, as soon as the necessary preparations could be made, to march to the coast, taking with them provisions as far as the- ' coast. The next day General Twiggs surrendered the force under his immediate command at San Antonio. The total fprce that was to be so embarked was 2,684 men. (Official Becords,, first series, vol. 1, page 524.) Of these, 320 men were stationed *489 at Forts Bliss, Quitman, and Davis, in the northwest. (Ib.,. 568.) On the 3d March both Hart and Jackson must have known that these posts were to be at once surrendered. In his capacity of quartermaster, Jackson must also have known the. fact reported by the officer who commanded the little force in its march across Texas, that there was only transportation enough at Fort Bliss to carry subsistence for forty days. (Ib.). If Jackson’s vouchers are to be believed, he laid in on the 3d March six months’ rations of flour for the whole force. When the surrender was made on the 9th May, at San Lucas Springs,, about fifteen miles west of San Antonio, Jackson’s name is not found among the list of officers reported as on duty at that time. (Ib.)
With all these independent facts pointing in one direction,, we have not hesitated to find as a resulting fact, bearing upon such vouchers as were subsequent in date to the 13tii April, 1861, that there is nothing due from the United States to the. claimant for flour delivered after April 13, 1861, and that the United States paid the said Hart or his assignees for flour-alleged to have been delivered after April 13, 1861, but never delivered, more than the amounts claimed in this suit as due for corn and forage, said payments being made partly in cash to him or his assignees, and partly by a credit allowed him as security for Grayson’s faithful performance of his official duties as. shown in the McKnight case. It is plain from the other facts found, that if it had been open to us to act upon the flour claims prior to April 13th, it would have been our duty also to find that nothing was due for them.
This finding is reached by assuming as a matter of law: 1st. That while Hart kept possession of the flour at El Paso,, there was no constructive delivery of it to the United States; and, 2d. That the court can make this finding, although the matter is not pleaded by the government as a set-off. If the claimant desires a review of our action in this respect, lie-is. entitled to have this stated.
III. In our opinion, however, it is of little consequence-whether this finding stands or falls. There are fatal objections, in law to the claimant’s recovery on the forage vouchers. They are three in number: one from Jackson and two from Treacy, who was stationed at Fort Craig as assistant quartermaster.. Jackson’s voucher and one of T-reacy’s vouchers were for goods *490 alleged to bave been delivered prior to April 13, 1861. No recovery can be bad on these.
Treacy’s second voucher was for corn delivered after April 13. At tbe former trial it was found that tbe only proof of tbe delivery of tbe corn was tbe voucher. Tbe voucher was transmitted by Treacy to Hart across the enemy’s lines. We held it to be absolutely void, and that there was no proof of ■-the alleged delivery. Tbe claimant has supplied other proof, and it is now found as a fact that tbe corn was delivered. It ■only remains to consider whether Treacy could lawfully trade across the lines on tbe 22d April, 1861.
On that day there existed in Texas not only tbe technical •state of war resulting from the President’s proclamation, but an actual state of conflict. Tbe effect of this upon private rights in tbe early stages of the rebellion has been tbe subject of frequent discussion in tbe Supreme Court. From tbe many •cases we deduce these general conclusions. Tbe theoretical rule which converts all inhabitants of enemy’s country into •enemies on tbe outbreak of a war, which ends business relations, dissolves partnerships, stops trade and intercourse, and makes unlicensed dealings illegal, is inflexible. In applying this rule to transactions interrupted by the outbreak of a civil war which commences without previous declaration and without the ordinary premonitory forebodings, the courts endeavor to lighten it •and mitigate its severity where its rigid application must produce inequity; but they have never swayed from it except for •such a purpose, and have never departed from it so far as to leave the principle out of sight.
In the present case we can see no equities to induce us to hesitate to apply rigidly the rule which made all trading with Hart, a public enemy, on the 22d April, 1861, illegal, and all claims and demands growing out of it absolutely void. The subsequent combination between Hart and G-rayson, and the dealings between Hart and Jackson, which have been examined, ■entitle Hart’s representative to the benefit of no equitable considerations. This transaction was wholly outside of the operation of a pardon. It was illegal from the outset, and never •constituted the foundation for a claim against the United States.
The judgment of the court is, as to so much of the claimant’s petition as relates to claims or demands which accrued or existed prior to the 13th day of April, 1861, that it be dismissed *491 for want of jurisdiction in this court to hear and determine said claims and demands, and without prejudice to the claimant; and as to so much of said petition as relates to claims and demands which accrued on or since the said 13th day-of April, 1861, that it be dismissed on the merits.