The WASHINGTON POST COMPANY, Plaintiff,

v.

UNITED STATES DEPARTMENT OF STATE et al., Defendants.

Civ. A. No. 80–1092.

United States District Court, District of Columbia.

Nov. 24, 1980.

John B. Kuhns, Robert C. Post, Washington, D.C., for plaintiff.

Nathan Dodell, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

GESELL, District Judge.

This Freedom of Information Act case is before the Court on cross-motions for summary judgment, which have been fully briefed and argued. Plaintiff is seeking access to records concerning expenditures made by the State Department from the appropriations for Emergencies in the Diplomatic and Consular Service. The State Department contends that the material is protected from disclosure under Exemption 3 of the Freedom of Information Act, 5 U.S.C. § 552(b)(3) (1976), which applies to material "specifically exempted from disclosure by statute," and cites as the controlling statutes 22 U.S.C. § 2671 (1976)[1] and 31 U.S.C. § 107 (1976).[2] Plaintiff argues that

1. The statute states:

   The Secretary of State is authorized to--
   (a) make expenditures, from such amounts as may be specifically appropriated therefor, for unforeseen emergencies arising in the diplomatic and consular service and, to the extent authorized in appropriation Acts, funds expended for such purposes may be accounted for in accordance with section 107 of Title 31; and

       (b) delegate to subordinate officials the authority vested in him by section 107 of Title 31 pertaining to certification of expenditures.

2. The statute states:

   Settlement of expenses of intercourse with foreign nations
       Whenever any sum of money has been or shall be issued, from the Treasury, for the purposes of intercourse or treaty with foreign nations, in pursuance of any law, the President is authorized to cause the same to be

these statutes are not sufficient to support a claim under Exemption 3. For reasons stated below, the Court sustains the secrecy of this special fund in order to carry out the manifest intention of Congress.

It will be instructive first to review briefly the sequence of events in this case. On October 3, 1979, a *Washington Post* investigative reporter wrote the State Department seeking "all records and other materials relating to the State Department's Fine Arts Committee." Two days later, before the State Department had responded to the reporter's first request, the reporter wrote a second letter supplementing his original request to include "some additional records that only partially relate to the finances of the committee." In this second letter the reporter stated that he desired access to the "ledger sheets and schedules of disbursements and receipts" from account numbered 19X8822 and from the account known as the Secretary of State's Emergency Fund. This enlarged request covered all material in the two accounts for the previous three years, and was no longer limited to payments relating to the Fine Arts Committee.

The State Department responded on October 29, 1979, agreeing to provide access to material included in account numbered 19X8822, but denying access to information concerning the Emergency Fund. The reporter appealed, and on March 6, 1980, the Appeals Review Panel of the Department of State again denied the request, stating that "a long history of practice and Congressional understanding" supported the claim for Exemption 3 under the statutes cited. The newspaper subsequently initiated this lawsuit, seeking access to all records of expenditures from the Emergency Fund for the past three years.

duly settled annually with the General Accounting Office, by causing the same to be accounted for, specifically, if the expenditure may, in his judgment, be made public; and by making or causing the Secretary of State to make a certificate of the amount of such expenditure, as he may think it advisable not to specify; and every such certificate shall be deemed a sufficient voucher for the sum therein expressed to have been expended.

It is clear from evidence presented by the parties that the Emergency Fund has been used to finance a variety of activities, ranging from payments to foreign informers in visa and passport fraud cases to receptions for donors to the Committee on Fine Arts.[3]

Exemption 3, amended in 1976 to narrow the exclusion, is quite explicit. Its coverage is limited to material

specifically exempted from disclosure by statute ... provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matter to be withheld.

The reasoning behind Exemption 3 and the congressional history of this exemption have been discussed by the Supreme Court, *see, e. g., Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 100 S.Ct. 2051, 2062–63, 64 L.Ed.2d 766 (1980), and analyzed at length by the Court of Appeals for this Circuit, *see, e. g., Founding Church of Scientology v. National Security Agency*, 610 F.2d 824, 826–29 (D.C. Cir. 1979); *Irons & Sears v. Dann*, 606 F.2d 1215, 1219–21 (D.C.Cir. 1979), *cert. denied*, 444 U.S. 1075, 100 S.Ct. 1021, 62 L.Ed.2d 757 (1980). There is no need to recite that history here. Suffice it to say that Exemption 3 is triggered only by statutes that either leave an administrator no discretion as to whether or not disclosure is permitted, or which provide sufficient guidance–by specifying particular criteria to be followed or by specifying only a limited range of material to be withheld–that the decision is "a legislative determination and not an administrative one." *Irons & Sears v. Dann, supra*, 606 F.2d at 1220.

3. At oral argument, the Court asked counsel for defendants to provide a generic index of the types of expenditures made from the Emergency Fund. A copy of the index provided is attached hereto as Appendix A. Although defendants offered to file an *in camera* memorandum describing the classified expenditures, the Court did not request such a memorandum.

■ Although there are no simple rules with which to determine whether 22 U.S.C. § 2671 (1976) and 31 U.S.C. § 107 (1976) are sufficient for Exemption 3, the Court's consideration of the two statutes and of other statutes analyzed under Exemption 3[4] make it clear that the exemption does not apply in this case. The statutes on which the State Department relies are too general in the discretion granted the Secretary and lack standards for the control of that discretion.

Under 22 U.S.C. § 2671 (1976), the Secretary of State simply is authorized to spend funds "for unforeseen emergencies arising in the diplomatic and consular service" and "may" account for those funds with the certification procedure set forth in 31 U.S.C. § 107 (1976). He also "may not" decide to use the certification procedure, however, and no guidance is provided as to when that discretion should be exercised. The wording of 31 U.S.C. § 107 (1976) is equally general, authorizing the Secretary of State to use the certification procedure for expenditures when "he may think it advisable not to specify" the use. There are no limiting criteria set forth.[5] Defendants concede that clause (A) of Exemption 3 does not apply, for the Secretary of State does have discretion whether to disclose information. It is equally clear that clause (B) cannot properly be invoked, because the statutes specify neither particular criteria nor particular types of material to be withheld.

Under both statutes, the Secretary's total discretion to withhold all expenditures from the Emergency Fund is simply too broad a blanket unqualified dispensation to fall within the exemption. Every statute necessarily will refer, with more or less specificity, to "particular types of matter." In the case of the Emergency Fund, it is undisputed that payments have been made from the Fund for state dinners and receptions, gifts to foreign individuals, expenses of Foreign Service inspectors, and receptions for contributors to the State Department's Fine Arts Committee. To permit the fact that all payments were made from the Emergency Fund to be by itself a sufficient standard to satisfy the "particular types of matter to be withheld" requirement would rob the standard of any meaning.

The State Department apparently concedes that the statutes themselves do not suffice to meet the standards for Exemption 3, for defendants have contended strenuously that "such apparent generality as may appear from the words of the law itself does not in practice exist." In particular, defendants argue that accounting requirements and precedent serve to check the Secretary's discretion with regard to the Emergency Fund. The Court recognizes that precedent has been invoked in other FOIA cases in analyzing the availability of Exemption 3. *See, e. g., Irons & Sears v. Dann, supra,* 606 F.2d at 1220–21. But here, unlike the circumstances in *Irons & Sears,* the precedents are so varied and the limits so few that it cannot fairly be said that precedent serves as an adequate check on the "broad agency discretion . . . that Congress sought to eliminate." *Sims*

---

**4.** For examples of statutes examined by courts under Exemption 3, *see, e. g., Consumer Product Safety Commission v. GTE Sylvania, supra,* (15 U.S.C. § 2055(b)(1) (1976)); *Halperin v. CIA,* 629 F.2d 144 (D.C.Cir. 1980) (50 U.S.C. §§ 403(d)(3) & 403g (1976)); *American Jewish Congress v. Kreps,* 574 F.2d 624 (D.C.Cir. 1978) (reviewing statute then codified at 50 U.S.C. App. § 2406(c)); *Serbian Eastern Orthodox Diocese v. Department of State,* No. 77–1413 (D.D.C., filed Dec. 30, 1977) (8 U.S.C. § 1202(f) (1976)).

**5.** At oral argument and in post–hearing submissions, the parties discussed whether the structure of the State Department's responsibilities did not impose certain limitations on expenditures. In an affidavit filed with the post–hearing briefs, Benjamin H. Read, Under Secretary of State for Management, stated that it was his interpretation of 22 U.S.C. § 2671 (1976) that he "may authorize public disclosure of expenditures from that appropriation when the particular public disclosure is determined not to be harmful to the conduct of foreign relations." Although this interpretation may provide some guidance for disclosure decisions, it clearly is the result of executive decisionmaking and not the product of legislative action. Thus, it can carry scant weight under Exemption 3. *Cf. American Jewish Congress v. Kreps,* 574 F.2d 624, 628 (D.C.Cir. 1978).

*v. CIA*, Nos. 79–2203 & 79–2554, slip op. at 14 (D.C.Cir., filed Sept. 29, 1980).

But this case does not fit neatly into the accepted analysis that has developed for applying Exemption 3 to various statutes granting discretionary authority to release or withhold information. The traditional authority is faulty here for there is brought into sharp conflict other actions by Congress indicating its intent, in the exercise of clear constitutional authority, to withhold the very information that the traditional Exemption 3 analysis would require be disclosed. Thus, although this case was briefed and argued as a typical Exemption 3 case, defendants' failure to withstand the type of analysis usually attempted in Exemption 3 cases cannot be permitted to end the matter in this particular unique instance.

The Court in the circumstances presented here must consider the actions of Congress in exercising its authority under the "Statement and Account Clause" found in Article 1, Section 9, Clause 7 of the United States Constitution. That clause states that

> No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time.

Congress has expressed its authority under the clause to keep the expenditures secret and this use of constitutional power cannot lightly be ignored.

The meaning of the Statement and Account Clause in the FOIA context recently was analyzed by the Court of Appeals for this Circuit in *Halperin v. CIA*, 629 F.2d 144 (D.C.Cir., 1980). In that case, the plaintiff sought information regarding employment of private attorneys by the CIA. The Court held that 50 U.S.C. § 403(d)(3) (1976) and 50 U.S.C. § 403g (1976) provided an exemption for the requested material under Exemption 3. The Court went on, however, and examined the history of the Statement and Account Clause. The Court concluded that "the Framers of the Clause intended it to leave discretion in Congress and the Executive to define reporting requirements for foreign intelligence operations and related expenditures." *Id.*, slip op. at 37.

The material sought here is closely related to the material sought in *Halperin,*[6] and the same result nondisclosure—must obtain. Although there have been recodifications through the years, 31 U.S.C. § 107 (1976) is derived from the Act of Feb. 9, 1793, 1 Stat. 299, 300, the same Act scrutinized in *Halperin* as the source of authority for secrecy in appropriating funds for the CIA. *See Halperin v. CIA, supra*, 629 F.2d at 158. It is uncontroverted that the Congress throughout history has granted the Executive authority to make payments without disclosing them publicly. Express authority was granted to the President in the Appropriations Act of 1887, 24 Stat. 478, 481, to spend funds for unforeseen emergencies in the diplomatic and consular service. Prior to that time, other amounts had been appropriated to be spent on the certificate of the Secretary of State for expenses in connection with the Neutrality Act. *See* H.R. Rep.No.2508, 84th Cong., 2d Sess. 13, *reprinted in* [1956] U.S.Code Cong. & Admin. News, pp. 4017, 4027. In 1956, Congress passed the statute now codified as 22 U.S.C. § 2671 (1976), which expressly grants the Secretary of State authority to make expenditures from the Emergency Fund and to account for the funds only by certificate. Pub.L.No.84 885, 70 Stat. 890–91 (1956). That statute has remained unchanged since 1956. It is clear, then, that the secrecy provided expenditures such as those that comprise the bulk of the Emergency Fund dates back to the beginning of the nation, and that the practice of certification by the Secretary of State has long been endorsed by Congress.

Although this appears to be the first case in which a plaintiff has sought access to

---

**6.** At least some of the money from the Emergency Fund has been spent specifically for foreign informers, *see* text at footnote 3, *supra,* & Appendix A, and the entire fund is restricted to use in the diplomatic and consular service, *see* 22 U.S.C. § 2671 (1976).

information concerning this particular fund, there has been significant litigation over similar limits on the reporting of expenditures by the Central Intelligence Agency. *See, e. g., United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Halperin v. CIA, supra* ; *Harrington v. Bush,* 553 F.2d 190 (D.C.Cir. 1977). These cases uniformly recognize "nearly two centuries of acceptance of a reading of cl. 7 [the Statement and Account Clause] as vesting in Congress plenary power to spell out the details of precisely when and with what specificity Executive agencies must report the expenditure of appropriated funds and to exempt certain secret activities from comprehensive public reporting." *United States v. Richardson, supra,* 418 U.S. at 178 n. 11, 94 S.Ct. at 2947 n. 11; *see Harrington v. Bush, supra,* 553 F.2d at 194 & n. 7. *See also* Note, *The CIA's Secret Funding and the Constitution,* 84 Yale L.J. 608, 609–616 (1975) (analyzing history and limits of "Statement and Account" Clause). Nearly 100 years ago, it was stated that in the appropriations area, "[t]he absolute control of the moneys of the United States is in Congress, and Congress is responsible for its exercise of this great power only to the people." *Hart's Case,* 16 Ct.Cl. 459, 484 (1880), *affirmed,* 118 U.S. 62, 6 S.Ct. 961, 30 L.Ed. 96 (1886). The same "absolute control" applies to control over the reporting of expenditures.

As far as the Emergency Fund is concerned, Congress has regularly exercised its oversight authority under the clause. Indeed, as recently as April of this year, Congress passed and the President signed legislation that subjects expenditures from the Emergency Fund to a limited audit by the General Accounting Office in order to ensure that funds are expended properly. *See* Pub.L.No.96–226, 94 Stat. 311 & S.Rep.96–570, 96th Cong., 2d Sess., *reprinted in* [1980] U.S.Code Cong. & Admin.News, pp. ——,

——. The law both strengthens Congress' oversight of uses of the Emergency Fund and preserves the secrecy of those expenditures, for GAO employees involved in the audit may release information only to other GAO employees and to the President, the Secretary of State, and, in certain instances, to members of Congress. *Id.* Furthermore, the President may exempt from this audit transactions that he determines should be kept in even stricter secrecy.[7]

For plaintiff to prevail in this case, the Court would be required to find that the Freedom of Information Act was intended to repeal this long–exercised authority by Congress to maintain secrecy in the expenditure of funds affecting the nation's foreign relations, and, in particular, secrecy in expenditures from the Emergency Fund. There is, of course, no indication in any legislative history that FOIA was ever for a moment intended to have any such effect. Indeed, the stringent controls on disclosure included in the recent legislation authorizing GAO audits of the Fund would be meaningless if a FOIA request could compel release of that same information. Under these circumstances, the Court will not impute to Congress the intent for such radical disclosures under FOIA, or the abandonment of its constitutional power, and the plenary authority of Congress in this area will be respected.

■ It should be noted that plaintiff has made a strong showing that the Emergency Fund can be used as a "catch–all" by the State Department, and that the State Department has essentially unbridled discretion in deciding what to disclose and what will remain secret. Furthermore, the fact that the State Department voluntarily has disclosed some of the expenditures from the Fund indicates that strict secrecy is not required in all instances.[8] But it is not for

---

**7.** Congress has passed two other bills in recent years as well that demonstrate its continuing scrutiny of the Emergency Fund. *See* Pub.L. No.95–105, 91 Stat. 866 (codified at 22 U.S.C. § 2694 (Supp. III 1979)) (requiring report to Congress on all gifts to foreign individuals purchased from the Emergency Fund); Pub.L.No.

94–350, 90 Stat. 827 (codified at 22 U.S.C. § 2690 (1976)) (establishing partial audit of Emergency Fund by GAO).

**8.** The court is mindful, of course, that the intent of FOIA is disclosure and does not mean to

this Court to determine which expenditures should be revealed and which should not,[9] just as it is not for this Court to order wholesale disclosures. The authority lies only with Congress and the Secretary of State.

For the foregoing reasons, plaintiff's motions for summary judgment and partial summary judgment are denied. Defendants' motion for summary judgment is granted. The case is dismissed. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

## APPENDIX A

### DEPARTMENT OF STATE

*Emergencies in the Diplomatic and Consular Service*

*Major Categories of Expenditures*

*Emergency Evacuations*–evacuation of U.S. Government employees and their dependents and private U.S. citizens when their lives are endangered by war, civil unrest or natural disaster. (Other U.S. government agencies reimburse the Department to cover expenses incurred on their behalf. Private U.S. citizens sign promissory notes to repay the cost of their evacuation. Repayment made during the fiscal year in which the expenditures were made are used to defray expenses incurred. Repayments received following the close of the fiscal year revert to the U.S. Treasury.)

*Relief and Repatriation Loans*–loans to destitute citizens abroad. Loans are made to U.S. citizens to provide for their return to the United States. Promissory notes are obtained. Funds collected are deposited to Miscellaneous Receipts of the Treasury.

*Visits by Foreign Chiefs of State or Heads of Government*–expenses incurred in connection with official visits to the President (State dinners, receptions, other food, lodging and travel expenses within the United States).

*Presidential Delegations to Foreign Inaugurations, Funerals, etc.*–travel expenses of the official U.S. delegations.

*Presidential, Vice–Presidential and Congressional Travel Abroad*–expenses incurred in connection with official travel to foreign countries including advance arrangements, escort and official entertainment.

*Secretary of State Travel*–expenses incurred by the Secretary in connection with travel in the U.S. and abroad including official entertainment.

*Domestic Representation and Entertainment*–expenses incurred by the Secretary and other principal officers in connection with official representational functions.

*Special Overseas Representation*–expenses incurred for official functions not covered by the Representation Allowance appropriation, e. g. American business representatives and Congressional delegations when the majority of the guests are not foreigners.

*Passport and Visa Fraud*–expenses incurred in connection with investigations and apprehension of groups or individuals involved in fraudulent issuance of U.S. passports and visas.

*Official Gifts to Foreign Dignitaries*–cost of gifts of nominal value given by the President, Vice President or Secretary of State.

Note: There are also some limited but highly classified expenditures directly related to sensitive foreign relations missions that cannot be disclosed in an unclassified document.*

---

discourage further disclosures by the Secretary of State to the extent he believes appropriate.

**9.** Even if this Court had the authority to determine which expenditures would properly be disclosed, and which would not, prudential concerns might well compel the Court to withhold its involvement in such a delicate, on–going task. *Cf. Winpisinger v. Watson,* 628 F.2d 133 (D.C.Cir., 1980).

\* During oral argument on November 5, 1980, the Court indicated that it would not be favorably disposed to an *in camera,* classified presentation of categories of expenditures which could not be disclosed in open court; however, the

Also during fiscal year 1980 and 1981, there have been expenditures made in connection with the Iranian hostage situation.

Department of State is prepared to make such a presentation should the Court wish.