**Morton H. HALPERIN, Appellant,**

v.

**CENTRAL INTELLIGENCE AGENCY.**

**No. 79–1849.**

United States Court of Appeals, District of Columbia Circuit.

Argued 16 April 1980.

Decided 11 July 1980.

Rehearing Denied Aug. 7, 1980.

William A. Dobrovir, Washington, D. C., for appellant. Joseph D. Gebhardt, Washington, D. C., also entered an appearance for appellant.

Al J. Daniel, Jr., Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee.

Before TAMM and WILKEY, Circuit Judges, and DAVIES,* United States Senior District Judge for the District of North Dakota.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Plaintiff Morton H. Halperin appeals from the district court's denial of his Freedom of Information Act (FOIA) suit for access to Central Intelligence Agency (CIA) documents detailing legal bills and fee agreements with private attorneys retained by the Agency. The district court granted summary judgment to the CIA, finding the requested documents to be specifically exempted from FOIA disclosure by two statutes, and holding that plaintiff lacked standing to challenge the constitutionality of those statutes.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

We affirm the district court's conclusion that the documents are statutorily exempted from disclosure, and we agree that under a controlling Supreme Court precedent plaintiff lacks standing. As explained later in our discussion of the issue of standing, we find it advisable to reach the merits on the constitutionality of the exempting statutes, and as an additional ground of our decision we hold that the CIA exempting statutes as applied in this case are not unconstitutional.

## I. FACTS AND PROCEDURAL BACKGROUND

In 1976 plaintiff Halperin made a request to the CIA for attorney retainer agreements, fee agreements, bills and statements, and related correspondence between the CIA and any attorneys or law firms retained by the CIA to perform legal services for the Agency or its employees since 17 June 1972. Plaintiff also sought access to Agency files for the purpose of locating and inspecting the requested materials.[1]

The CIA released those documents that concerned legal services rendered on an unclassified basis, but withheld documents pertaining to names of attorneys and details of legal services connected with covert or classified activities, except to release its standard contract used in retaining attorneys for classified CIA activities. In support of this action the CIA cited Exemption 1 of the FOIA for classified national defense and foreign policy documents, and Exemption 3 for documents specifically exempted by statute.[2]

The district court rested its summary judgment decision on Exemption 3 and found it unnecessary to decide the applicability of Exemption 1. Judge Oliver Gasch found that section 102(d)(3) of the National Security Act, 50 U.S.C. § 403(d)(3) (1976),

exempted all the withheld documents through its protection of intelligence sources and methods from unauthorized disclosure. As an additional ground of decision under Exemption 3, the court found information about legal fees and similar agency expenditures in the nature of salaries to be specifically exempted by section 6 of the Central Intelligence Agency Act, 50 U.S.C. § 403g (1976).[3]

Plaintiff further claimed that the application of these statutes under Exemption 3 violates Article I, Section 9, Clause 7 of the United States Constitution, which requires *inter alia* a "statement and account" of public expenditures. In response to this argument Judge Gasch noted the Supreme Court's rejection of taxpayer standing to raise the same constitutional challenge to 50 U.S.C. § 403g in the case of *United States v. Richardson*.[4] Judge Gasch held that this lack of standing bars a FOIA requester as well as a taxpayer, and therefore there is no standing for plaintiff in this case.[5]

## II. APPLICATION OF FOIA EXEMPTION 3

### A.

In reviewing the district court's decision, we first look at whether the court properly applied the statutes cited by the CIA as grounds for invoking FOIA Exemption 3. This exemption protects from disclosure those matters that are "specifically exempted from disclosure by statute," provided that such statute "(A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld . . . .."[6]

1. *See Halperin v. CIA*, No. 77–1859, slip op. at 1 2 (D.D.C. 25 July 1979).

2. 5 U.S.C. § 552(b)(1), (3) (1976).

3. *See Halperin v. CIA*, No. 77–1859, slip op. at 4 7 (D.D.C. 25 July 1979).

4. 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974).

5. *See Halperin v. CIA*, No. 77 1859, slip op. at 7 (D.D.C. 25 July 1979).

6. 5 U.S.C. § 552(b)(3) (1976).

This court has consistently held sections 403(d)(3) and 403g of Title 50 to be exempting statutes of the type described in FOIA Exemption 3.[7] Section 403(d)(3) provides in pertinent part: "That the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure."[8] Section 403g further provides for the exemption of the CIA from any law that requires disclosure of the organization, functions, names, official titles, salaries or numbers of personnel employed by the Agency.[9]

The district court properly applied a standard exempting under 50 U.S.C. § 403(d)(3) those documents that the Agency demonstrates "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods."[10] The Agency attempted to satisfy this standard by means of evidence presented in the deposition of John F. Blake, Deputy Director for Administration for the CIA,[11] and in affidavits from Blake[12] and from Robert E. Owen, Information Review Officer for the CIA.[13] In their statements these officials presented evidence pertaining to disclosure of the two types of information under dispute, the names of attorneys retained for covert CIA activities and the legal fees paid to them by the CIA.

**B.**

Concerning the disclosure of names of attorneys, Deputy Director Blake testified at a deposition that each attorney connected with covert CIA activities and implicated by plaintiff's FOIA request was an intelligence method within the meaning of section 403(d)(3), and that identification of such attorneys could reasonably be expected to lead to the disclosure of other intelligence sources and methods.[14] Both CIA officials explained in their statements that disclosure of attorney names could result in harm to the individuals identified, in harm to the CIA's efforts to recruit other personnel for covert intelligence-related operations, and in harm to other intelligence sources and methods through the providing of useful leads to the intelligence agencies of hostile powers.[15] Based on the affidavits and deposition, the district court concluded that the disclosure of attorney names, even with the deletion of details tending to identify the underlying transaction, could reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods.[16]

In reviewing this decision of the district court, we note initially that Congress has indicated that courts should give "substan-

7. See Goland v. CIA, 607 F.2d 339, 349-50 (D.C.Cir.1978), cert. denied, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); Ray v. Turner, 587 F.2d 1187, 1196 (D.C.Cir.1978); Baker v. CIA, 580 F.2d 664, 668-69 (D.C.Cir.1978); Weissman v. CIA, 565 F.2d 692, 694 (D.C.Cir.1977); Phillippi v. CIA, 546 F.2d 1009, 1015 n.14 (D.C.Cir.1976).

8. 50 U.S.C. § 403(d)(3) (1976).

9. Section 403g provides:
In the interests of the security of the foreign intelligence activities of the United States and in order further to implement the proviso of section 403(d)(3) of this title that the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure, the Agency shall be exempted from the provisions of . . . any other law which require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency: Provided, That in furtherance of this section, the Director of the Office of Management and Budget shall make

no reports to the Congress in connection with the Agency under section 607 of the Act of June 30, 1945, as amended (5 U.S.C. 947(b)).
Id. § 403g (1976).

10. Halperin v. CIA, No. 77 1859, slip op. at 5 (D.D.C. 25 July 1979). See Phillippi v. CIA, 546 F.2d 1009, 1015 n.14 (D.C.Cir.1976).

11. See Joint Appendix (J.A.) at 17.

12. See id. at 5, 12.

13. See Record at 10.

14. See Halperin v. CIA, No. 77 1859, slip op. at 5-6 (D.D.C. 25 July 1979).

15. See Affidavit of John F. Blake, J.A. at 8; Affidavit of Robert E. Owen ' 8, Record at 10; Deposition of John F. Blake, J.A. at 44–45.

16. See Halperin v. CIA, No. 77-1859, slip op. at 6 (D.D.C. 25 July 1979).

tial weight" to such agency statements while conducting a *de novo* review of agency decisions that withhold information on the basis of FOIA Exemption 1.[17] The logic of this judicial review standard applies equally to all national security FOIA cases, whether they arise formally under Exemption 1 or Exemption 3.[18] In past cases this court has interpreted the proper means of applying the "substantial weight" standard to Exemption 1 and Exemption 3 cases. We have held that summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.[19]

■■■ If the agency's statements meet this standard, the court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency.[20] Judges, moreover, lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case. Within this limited standard for *de novo* review, we find that the CIA affidavits and deposition provide more than ample evidence to show the plausibility of the alleged potential harm, in a manner that is reasonably detailed rather than conclusory.

Appellant has presented no evidence to contradict the Agency or to show Agency bad faith. On appeal appellant rests on an argument that the Agency's explanations are conclusory, speculative, and insufficient to carry the Agency's burden of proof under a *de novo* standard of review in the district court.[21] A summary of the details presented by the CIA, however, demonstrates that appellant's argument has no merit, and that the Agency's showing of potential harm is not only plausible but very convincing.

First, the CIA statements show that the disclosure of the identity of an attorney doing work for the CIA might expose him to adverse action from hostile powers. Attorneys performing services connected to CIA activities in foreign countries of course face the harshest risk from exposure of their activities, as the CIA affidavits in this case explain.[22] Exposure of a CIA operative in a foreign country can further lead to embarrassment for the United States and disruption of relations with foreign countries.[23] Though the hazards for American attorneys are not so great, public disclosure of an affiliation with the CIA may have adverse consequences for them as well.[24]

17. S.Rep.No.1200, 93d Cong., 2d Sess. 12 (1974), U.S.Code Cong. & Admin.News 1974, pp. 6267, 6290. *See Hayden v. NSA*, 608 F.2d 1381, 1384, 1387 (D.C.Cir.1979), *cert. denied*, U.S. ·--- , 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).

18. *Cf. Founding Church of Scientology v. NSA*, 610 F.2d 824, 836 (D.C.Cir.1979); *Goland v. CIA*, 607 F.2d 339, 352 (D.C.Cir.1978) (applying "substantial weight" standard of review to Exemption 3 case), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

19. *See Hayden v. NSA*, 608 F.2d 1381, 1387 (D.C.Cir.1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (No. 79 1334); *Founding Church of Scientology v. NSA*, 610 F.2d 824, 836 (D.C.Cir.1979); *Goland v. CIA*, 607 F.2d 339, 352 (D.C.Cir.1978), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *Ray v. Turner*, 587 F.2d 1187, 1194 95 (D.C.Cir.1978); *Weissman v. CIA*, 565 F.2d 692, 697–98 (D.C.Cir.1977).

20. *Cf. Hayden v. NSA*, 608 F.2d 1381, 1388 (D.C.Cir.1979) ("for us to insist that the Agency's rationale here is implausible would be to overstep the proper limits of the judicial role in FOIA review"), *cert. denied*, U.S. ·· , 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).

21. *See* Brief for Appellant at 27 28.

22. *See* Affidavit of John F. Blake, J.A. at 8. *See also Snepp v. United States*, 444 U.S. 507, 512, 100 S.Ct. 763, 767, 62 L.Ed.2d 704 (1980) ("The continued availability of these foreign sources depends upon the CIA's ability to guarantee the security of information that might compromise them and even endanger the personal safety of foreign agents.").

23. *See* Affidavit of John F. Blake, J.A. at 8.

24. *See id.*; Deposition of John F. Blake, J.A. at 42 45.

Second, the CIA's inability to protect the anonymity of its agents in any part of the world is a strong disincentive to those who are considering future employment or continued affiliation with the CIA.[25] Deputy Director Blake stated in his deposition that he had personal knowledge of "at least two United States attorneys who had been cooperative with us in a classified relationship who, based on continuing disclosures in the last several years, have asked that we would withdraw from the relationship with them."[26]

Finally, as Deputy Director Blake stated in his affidavit, the "primary reason for withholding attorney's identities who are agents of the CIA in intelligence activities is that such disclosure will tend to reveal details of those activities."[27] Blake elaborated on this concern in his deposition:

> If the name appears in the press, the name is available then to representatives of hostile, foreign intelligence services working in this country who, by a variety of techniques, can undertake courses of action to ascertain what other contacts, what other locations, and then arrive at determinations whether he is doing any other function for the Central Intelligence Agency.[28]

The functions endangered by such disclosures include legal name changes for defectors, the creation of commercial entities, acquisitions of real estate, and settlements of affairs of deceased CIA operatives overseas.[29] All these functions are performed by lawyers and often require secrecy. Fears of potential harm from unauthorized disclosure of such functions are certainly reasonable, even from the perspective of someone not trained in intelligence operations.

Appellant further contends that the CIA's projection of potential harm is "pure speculation," and that the CIA is merely "hypothesizing a possible way in which intelligence methods might be revealed."[30] A court must take into account, however, that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm rather than an actual past harm. If we were to require an actual showing that particular disclosures of the identities of CIA-retained attorneys have in the past led to identifiable concrete harm, we would be overstepping by a large measure the proper role of a court in a national security FOIA case. The question that Congress has placed before us is only whether the predicted danger is a reasonable expectation; and it is precisely on this point that a court, lacking expertise in the substantive matters at hand, must give substantial weight to agency statements, so long as they are plausible and not called into question by contrary evidence or evidence of agency bad faith.

In the present case, a stricter standard for the showing of potential harm could very seldom be satisfied. As Deputy Director Blake stated, when a hostile intelligence service is properly doing its job it can carry out various counter-intelligence operations against covert CIA operations, "without drawing attention to itself, and we have no way of knowing."[31] Appellant's argument that the CIA has not shown any past instances of concrete harm to agency-retained lawyers[32] ignores this fact, and also ignores that the purpose of national security exemptions to the FOIA is to protect intelligence sources before they are compromised and harmed, not after: "The problem is to ensure *in advance*, and by proper pro-

25. *See* Affidavit of John F. Blake, J.A. at 8.

26. Deposition of John F. Blake, J.A. at 44-45.

27. Affidavit of John F. Blake, J.A. at 9.

28. Deposition of John F. Blake, J.A. at 42.

29. *See* Affidavit of John F. Blake, J.A. at 9.

30. Brief for Appellant at 27.

31. Deposition of John F. Blake, J.A. at 43.

32. *See* Brief for Appellant at 27.

cedures, that information detrimental to national interest is not published."[33]

To summarize our conclusion on the issue of exemption for names of CIA-retained attorneys, we find that the CIA has submitted reasonably detailed, nonconclusory statements showing the applicability of section 403(d)(3), that these statements are plausible on their face, and that the record contains no contrary evidence or evidence of Agency bad faith. Once substantial weight is given to these statements, there remain no substantial and material facts in dispute. The district court's grant of summary judgment is therefore entirely appropriate on the issue of disclosing names of attorneys.[34]

### C.

On the issue of legal fees, the district court found nondisclosure to be justified by both section 403(d)(3) and section 403g of title 50. Based on CIA statements, the court concluded that disclosure of legal fees could reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods under section 403(d)(3), because trained foreign personnel could gain useful insights from such information.[35]

On review we apply the same standards described above for the issue of attorney names. Appellant has not offered evidence to contradict the Agency or to show Agency bad faith. The issue is whether the Agency's statements contain reasonable specificity of detail to support the district court's application of section 403(d)(3).

The Agency's general rationale for refusing to disclose rates and total fees paid to attorneys is that such information could give leads to information about covert activities that constitute intelligence methods. For example, if a large legal bill is incurred in a covert operation, a trained intelligence analyst could reason from the size of the legal bill to the size and nature of the operation.[36] This scenario raises a reasonable possibility of harm to the covert activity following from disclosure of the size of legal fees.[37] We note that the CIA's showing of potential harm here is not so great as its showing concerning attorney names. We must take into account, however, that each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself. When combined with other small leads, the amount of a legal fee could well prove useful for identifying a covert transaction. Viewed in this light, the Agency's statements offer sufficient plausible detail for a court to accord substantial weight to the statements and accept the Agency's expert judgment on the potential effects of disclosing legal fees. We therefore affirm the district court's application of section 403(d)(3) to this matter.

### D.

The district court also found legal fees to be protected from FOIA disclosure by section 403g of Title 50. This section, quoted above,[38] protects against the disclosure of the "organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." The district court held that CIA expenditures for legal fees fall within this language, since they are "in the nature of salaries."[39] Appellant contends that CIA-retained attorneys are not

---

**33.** *Snepp v. United States,* 444 U.S. 507, 513, 100 S.Ct. 763, 767 n.8, 62 L.Ed.2d 704 (1980) (emphasis in original).

**34.** *See, e. g., Founding Church of Scientology v. NSA,* 610 F.2d 824, 836 (D.C.Cir.1979).

**35.** *See Halperin v. CIA,* No. 77-1859, slip op. at 7 (D.D.C. 25 July 1979).

**36.** *See* Deposition of John F. Blake, J.A. at 51.

**37.** *See* Supplemental Affidavit of John F. Blake, J.A. at 14.

**38.** *See* note 9 *supra.*

**39.** *Halperin v. CIA,* No. 77-1859, slip op. at 7 (D.D.C. 25 July 1979).

personnel employed by the CIA and that payments to them are not "salaries."[40]

Concerning the first of these contentions, it is true that the CIA's standard retainer agreement defines the status of a retained attorney as "independent contractor" and disclaims any employee-employer relationship.[41] There are of course lines of cases, cited by appellant, that distinguish between employees and independent contractors for various legal purposes.[42] We note, however, that section 403g does not use the term of art "employee" but rather the phrase "personnel employed by the agency." To determine the proper meaning of this phrase in context, we must examine the indications of congressional intent rather than apply a formalistic distinction between employee and independent contractor which was created for legal contexts far removed from section 403g.

Section 403g itself contains language indicating Congress's intent. Congress enacted the section to promote "the interests of security of the foreign intelligence activities of the United States," and to further the protection of "intelligence sources and methods from unauthorized disclosure . . . ."[43] The foreign intelligence activities of the United States are frequently carried out by personnel who have no formal or regular employee status with the CIA. The nature of the CIA's intelligence function often requires the services of persons affiliated with the Agency only temporarily; this is obviously the case with the services of private attorneys needed from time to time in connection with clandestine CIA activities. Such employment relationships are integral and essential to many Agency functions.

Only by recognizing such personnel as "employed by the Agency" within the language of section 403g can we give reasona-ble effect to the congressional intent in that section to protect the security of foreign intelligence . activities and to further the protection of intelligence sources and methods. The further congressional intent to protect "the confidential nature of the Agency's functions"[44] leaves no room for a fine and formalistic distinction between functions performed by CIA staff attorneys operating under cover and functions performed by private attorneys pursuant to contract. A contrary interpretation could seriously impair the CIA's ability to conduct classified operations with temporarily affiliated personnel.

These same expressions of congressional intent preclude an interpretation of the term "salaries" that would include only payments to regularly employed CIA staff personnel. Payments to clandestine temporarily affiliated personnel are at least as, probably more, likely to reveal intelligence sources and methods as are payments to CIA staff. To give section 403g the scope Congress evidently intended, we must include as "salaries" any payments made in compensation for services performed by personnel employed by the Agency.

In light of express congressional intent, we hold that such payments to CIA-retained attorneys are in the nature of salaries to personnel employed by the CIA, and are therefore within the listing of specific information protected from disclosure under section 403g. The requested information about legal fees is thus within the narrow interpretation of section 403g described in this court's previous opinions.[45]

We therefore affirm the district court's exemption of legal fees under both section 403g and section 403(d)(3) of Title 50. Summary judgment was appropriate under these circumstances because, giving sub-

---

40. *See* Brief for Appellant at 20–21.

41. Exhibit to Affidavit of John F. Blake, J.A. at 10 11.

42. *See* Brief for Appellant at 21.

43. 50 U.S.C. § 403g (1976). For full text of this section, see note 9 *supra*.

44. S.Rep.No.106, 81st Cong., 1st Sess. 1 (1949) (stating purpose of CIA Act of 1949, of which section 403g is a part).

45. *See Baker v. CIA*, 580 F.2d 664, 670 (D.C. Cir.1978); *Phillippi v. CIA*, 564 F.2d 1009, 1015 n.14 (D.C.Cir.1976).

stantial weight to the Agency statements under the standards described above, the CIA has succeeded in carrying its burden of showing that no substantial and material facts remain in dispute and that the Agency is entitled to judgment as a matter of law.[46]

### III.  STANDING

█ Since the requested documents were properly found to be within the provisions of two Exemption 3 statutes, appellant can prevail only if those statutes are held unconstitutional.  Appellant claims that the statutes, insofar as they prevent disclosure of information about CIA expenditures, violate Article 1, Section 9, Clause 7 of the United States Constitution (hereinafter "Clause 7" or "Statement and Account Clause"), which provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."

For appellant to challenge the CIA's Exemption 3 statutes on constitutional grounds, he must first show that he has standing to raise this issue.  Unfortunately for appellant, the Supreme Court decided a similar question of standing in *United States v. Richardson*.[47]  In Chief Justice Burger's opinion the Court held that a federal taxpayer does not have standing to raise a constitutional challenge under the Statement and Account Clause against those provisions of the Central Intelligence Agency Act of 1949 which require secrecy for the appropriations and expenditures of the CIA, the very provisions at issue here.

Appellant attempts to distinguish *Richardson* on grounds that he has standing under the FOIA, while Richardson claimed standing only as a taxpayer.  The merit of this distinction depends on the breadth the Supreme Court intended for its *Richardson*

holding.  We find that the language of *Richardson* indicates that the Supreme Court intended a holding broad enough to cover all challenges to the CIA Act under the Statement and Account Clause, whether by a mere taxpayer or by a FOIA plaintiff.

The key fact in *Richardson* was that the injury alleged by plaintiff was undifferentiated and common to all members of the public.[48]  In the present case this key fact is unchanged; like Richardson, plaintiff here has not shown the "particular concrete injury" required for standing.[49]

That the Supreme Court intended a holding broad enough to cover the present case is further suggested by the Court's willingness to accept the prospect that no one would ever have standing to challenge CIA fiscal secrecy.  The opinion of the Court observed that "the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process."[50]  This statement is a broad holding, applying to other persons and circumstances, rather than one narrowed to Richardson and the facts of his suit.  The argument for committing the matter to Congress and the political process, rather than to the courts, applies with equal logical force against a FOIA plaintiff as against a citizen or taxpayer plaintiff.

We recognize that it can be reasonably argued that the FOIA creates a new situation in which a plaintiff such as Halperin or Richardson can now claim standing not merely as a taxpayer, but as a person who has suffered concrete injury in the denial of a statutorily authorized FOIA request for CIA budget information.  But the facts as well as the reasoning of the *Richardson* case convince us that this precedent precludes standing for FOIA plaintiff Halperin.  The FOIA is not a new factor added since *Rich-*

---

46.  *See, e. g., Founding Church of Scientology v. NSA*, 610 F.2d 824, 836 (D.C.Cir.1979).

47.  418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974).

48.  *See id.* at 177, 94 S.Ct. at 2946.

49.  *Id.*

50.  *Id.* at 179, 94 S.Ct. at 2947.

*ardson* was decided; the FOIA existed at the time of the *Richardson* case, was in fact cited as a ground of jurisdiction in Richardson's complaint,[51] and was mentioned in a footnote to the opinion for the Court without any intimation that it might provide a loophole through which plaintiff could gain standing.[52] Mr. Justice Stewart's dissenting opinion in *Richardson* noted the logical implications of the majority's holding for standing of a FOIA plaintiff:

> For example, the Freedom of Information Act creates a private cause of action for the benefit of persons who have requested certain records from a public agency and whose request has been denied. . . . it confers a right on "any person" to receive those records, subject to published regulations regarding time, place, fees, and procedure. The analogy, of course, is clear. If the Court is correct in this case in holding that Richardson lacks standing under Art. III to litigate his claim that the Statement and Account Clause imposes an affirmative duty that runs in his favor, *it would follow that a person whose request under 5 U.S.C. § 552 has been denied would similarly lack standing under Art. III* despite the clear intent of Congress to confer a right of action to compel production of the information.[53]

For a FOIA plaintiff as well as a taxpayer, the constitutional objection to the CIA's fiscal secrecy is shared in common with all members of the public, and under the logic of *Richardson* this factor bars standing.[54] The facts and reasoning of the *Richardson* decision, as discussed above, point to the conclusion that, at least for statutes protecting CIA fiscal secrecy, the FOIA does not create standing to challenge the constitutionality of the CIA's budgetary secrecy.

Two district courts have reached the same conclusion, holding that CIA budget secrecy statutes cannot be challenged on constitutional grounds by FOIA plaintiffs, albeit without elaborating their reasoning. One of these cases arose soon after the Supreme Court's *Richardson* decision, when plaintiff Richardson filed a FOIA complaint against the CIA and the Treasury Department, once more seeking access to CIA financial records. Judge Gourley of the

---

51. *See* Complaint ¶¶ 6, 56, *United States v. Richardson, reprinted in* 13 U.S. Supreme Court, Transcripts of Records and File Copies of Briefs, 1973, No. 72–885, Appendix at 3, 15. The nature of Richardson's suit is not precisely defined by his complaint. From the complaint as a whole, however, it is evident that Richardson requested CIA expenditure reports from the Treasury Department, that his request was denied on the basis of the CIA exempting statutes among other reasons, that he challenged CIA fiscal secrecy on the basis of Article I, Section 9, Clause 7 of the Constitution, and that he sought injunctive relief pursuant to the FOIA and other statutory provisions. *See id.* ¶¶ 6, 9–12, *reprinted in* 13 U.S. Supreme Court Transcripts of Records and File Copies of Briefs, 1973, No. 72–885, Appendix at 3–5. In these aspects his suit bore a substantial resemblance to a FOIA suit, though it was not formally treated as such by the courts in the ensuing litigation.

52. *See* 418 U.S. at 175 n.8, 94 S.Ct. at 2946.

53. *United States v. Richardson*, 418 U.S. at 204–05, 94 S.Ct. at 2960 (Stewart, J., joined by Marshall, J., dissenting) (emphasis added).

54. The present case can also be analyzed in terms of the "nexus test" established by the Supreme Court in *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), and followed by the Court in *United States v. Richardson*, 418 U.S. at 174–75, 94 S.Ct. at 2945–46. The nexus test requires that in order to have standing to raise a generalized grievance as a taxpayer, a plaintiff must show a "nexus between his status and the nature of the allegedly unconstitutional action," *Flast v. Cohen*, 392 U.S. at 106, 88 S.Ct. at 1995; that is, he must show that he is challenging an enactment under the taxing and spending clause of the Constitution, and that he is claiming that the challenged enactment exceeds specific constitutional limitations on Congress's taxing and spending power. *See United States v. Richardson*, 418 U.S. at 173, 94 S.Ct. at 2944. Plaintiff in *Richardson* did not show the required "nexus":

> "Although the status he rests on is that he is a taxpayer, his challenge is not addressed to the taxing and spending power, but to the statutes regulating the CIA, specifically 50 U.S.C. § 403j(b)." *Id.* at 175, 94 S.Ct. at 2945. In the present case, plaintiff presents a grievance as a requester under the FOIA, but this status as a FOIA requester bears no nexus to his constitutional challenge to the statutes regulating the CIA.

Western District of Pennsylvania found those records to be within Exemption 1 and Exemption 3 of the FOIA and thus not subject to disclosure.[55] As to the constitutionality of the exempting statutes the court did not express a view; but in light of Richardson's claim that he raised a constitutional challenge under the Statement and Account Clause,[56] the district court's decision implicitly assumes that he could not validly make the challenge.

The second district court case followed nearly identical lines, with a FOIA suit filed by the same Halperin who appeals now. Judge John Lewis Smith of the D.C. District Court found the requested CIA budget data to be within Exemption 3, and did not comment on the constitutionality of the exempting statutes except by implication in a *"see also"* cite to *United States v. Richardson.*[57]

Based on the reasoning of *Richardson* and the example of these two district court decisions, we affirm the district court's holding here that plaintiff lacks standing to challenge the constitutionality of the Exemption 3 statutes that ensure secrecy for CIA fiscal data. In applying the logical implications of the *Richardson* decision to this case, we acknowledge that the majority of the Supreme Court did not *expressly* consider in that case whether a plaintiff in the position of Richardson or Halperin might have standing specifically under the FOIA. Especially in light of the narrow 5–4 margin of decision in *Richardson*, we do not overlook the possibility that the Supreme Court could narrow the *Richardson* holding so as not to bar standing for a FOIA plaintiff to challenge the constitutionality of the exempting statutes.

With this possibility in mind, and considering that judicial economy is best served by our resolving all relevant issues at this stage, we proceed to consider the merits of plaintiff's constitutional claim as an equal alternative ground of our decision. Although the district court did not address this issue, we decline to remand for further argument and fact-finding at the trial court level, since the issue is purely one of law and the relevant considerations have been substantially briefed here by both parties.

## IV. CONSTITUTIONALITY AND JUSTICIABILITY OF STATUTORY SECRECY FOR CIA EXPENDITURES

■ Appellant claims that sections 403(d)(3) and 403g of Title 50 are unconstitutional insofar as they authorize the withholding of CIA expense data approved by the district court in this case.[58] The CIA replies that under the political question doctrine the Statement and Account Clause does not present a justiciable matter.[59] Finding the political question doctrine closely bound up with the merits, we investigate the history of the Statement and Account Clause for the light it sheds on both questions. Our inquiry takes notice of a broad range of evidence from our nation's early history, focusing throughout on whether the Statement and Account Clause was intended to require the public disclosure of such information as is requested here. Relevant to this inquiry are several major categories of historical evidence, including statements by the Framers of the Clause, statements reflecting a contemporaneous understanding of the Framers' intent, and governmental practices with regard to disclosure of similar information both before and after the enactment of the Constitution.

### A.

The Statement and Account Clause was first proposed in the final week of the Con-

---

55. See *Richardson v. Spahr*, 416 F.Supp. 752 (W.D. Pa.), *aff'd mem.*, 547 F.2d 1163 (3d Cir. 1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

56. See Petitioner's Brief for Certiorari at 6, *Richardson v. Spahr*, 434 U.S. 830, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

57. See *Halperin v. Colby*, No. 75–0676, slip op. at 4 (D.D.C. 4 June 1976).

58. See Brief for Appellant at 9.

59. See Brief for Appellee at 35.

stitutional Convention, when George Mason moved on 14 September 1787 that a clause be adopted requiring "that an Account of the public expenditures should be annually published."[60] In the initial debate on this proposal, Gouveneur Morris urged that such accounting would be "impossible in many cases," and Rufus King remarked that it would be "impracticable" to account for "every minute shilling."[61] James Madison then proposed an amendment to require an accounting "from time to time" rather than annually. The Convention adopted this amendment and enacted Clause 7 in its presently existing form.

The debate surrounding the adoption of Madison's amendment proves important for our inquiry. Farrand gives a brief account of the debate at the Convention, taken from Madison's notes. Madison thought that the substitution of "from time to time" for "annually" would ensure frequent publication and "leave enough to the discretion of the Legislature."[62] Madison's notes from the Convention do not elaborate on the concept of legislative discretion, except to say that if too much is required, "the difficulty will beget a habit of doing nothing."[63]

The rational behind Madison's amendment came more fully to light in the debate in the Virginia ratifying convention. On 12 June 1788 Madison stated that under the Constitution as proposed, congressional proceedings were to be "occasionally published," and that this requirement included all receipts and expenditures of public money.[64] He praised this as a security not enjoyed under the then existing system of government. Then, in a sentence reflecting on the degree of discretion to be allowed under Clause 7, he stated: "That part which authorizes the government to withhold from the public knowledge what in their judgment may require secrecy, is imitated from the confederation—that very system which

the gentleman advocates."[65] Although we would hesitate to draw a firm conclusion from this passage alone, Madison's language strongly indicates that he believed that the Statement and Account Clause, following his amendment, would allow government authorities ample discretion to withhold some expenditure items which require secrecy.

Any ambiguity in Madison's statement is removed, moreover, by a more lengthy debate that occurred five days later on 17 June 1788 between Madison and George Mason. Arguing against Madison's "from time to time" provision, Mason criticized it as too loose an expression. He then summarized the arguments made by proponents of the provision:

> The reasons urged in favor of this ambiguous expression, was [sic], that there might be some matters which might require secrecy. In matters relative to military operations, and foreign negotiations, secrecy was necessary sometimes. But he did not conceive that the receipts and expenditures of the public money ought ever to be concealed. The people, he affirmed, had a right to know the expenditures of their money.[66]

Mason's statement clarifies several points concerning the Framers' intent. First, it appears that Madison's comment on governmental discretion to maintain the secrecy of some expenditures, far from being an isolated statement, was representative of his fellow proponents of the "from time to time" provision. Second, as to what items might legitimately require secrecy, the debates contain prominent mention of military operations and foreign negotiations, both areas closely related to the matters over which the CIA today exercises responsibility. Finally, we learn that opponents of the "from time to time" provision, exem-

---

60. 2 M. Farrand, The Records of the Federal Convention of 1787, at 618 (rev. ed. 1966).

61. *Id.*

62. *Id.* at 619.

63. *Id.*

64. 3 M. Farrand, The Records of the Federal Convention of 1787, at 311 (rev. ed. 1966).

65. *Id.*

66. *Id.* at 326.

plified by Mason, favored secrecy only for the operations and negotiations themselves, not for receipts and expenditures of public money connected with them. But the Statement and Account Clause, as adopted and ratified, incorporates the view not of Mason, but rather of his opponents, who desired discretionary secrecy for the expenditures as well as the related operations.

In reply to Mason's argument, Madison did not pursue the point on the need for secrecy, but argued that publication from time to time would provide more satisfactory and fuller reports to the public and would be of sufficient frequency. He added that he believed "this provision went farther than the constitution of any state in the union, or perhaps in the world."[67] The remainder of the exchange between Madison and Mason was brief, and did not touch on secrecy of expenditures.[68]

In addition to the statements of Madison and Mason, we find only one other statement from the Virginia ratifying convention expressing a view on the secret expenditure issue. This is a statement of Patrick Henry on 15 June 1788, apparently expressing a fear of the effect of the "from time to time" provision: "By that paper the national wealth is to be disposed of under the veil of secrecy; for the publication from time to time will amount to nothing, and

they may conceal what they may think requires secrecy. How different it is in your own government!"[69] Though perhaps more exaggerated than Mason's language, Henry's statement further confirms our interpretation of the Madison-Mason debate.

Viewed as a whole, the debates in the Constitutional Convention and the Virginia ratifying convention convey a very strong impression that the Framers of the Statement and Account Clause intended it to allow discretion to Congress and the President[70] to preserve secrecy for expenditures related to military operations and foreign negotiations. Opponents of the "from time to time" provision, it is clear, spoke of precisely this effect from its enactment. We have no record of any statements from supporters of the Statement and Account Clause indicating an intent to require disclosure of such expenditures.

### B.

The direct evidence of the intent of the Framers, then, indicates that the Statement and Account Clause does not require disclosure of such expenditures as appellant requests in the present case. Though we would be confident in resting on this evidence alone, we find yet further confirmation in the historical evidence of government practices with regard to disclosure

67. *Id.*

68. *See id.* at 326-27.

69. 3 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 462 (1836).

70. The statements of the Framers quoted above in text mention the "government" as holding discretion to maintain secrecy. Madison mentioned the legislature specifically, but not exclusively. *See* pp. 154-155 *supra.* That the President shares in this discretion is suggested by one of the Federalist Essays of John Jay, who had gained diplomatic experience in the service of the Continental Congress during the Revolution and of the Confederation afterwards. Commenting on the newly proposed Constitution, he observed:

It seldom happens in the negotiation of treaties of whatever nature, but that perfect *secrecy* and immediate *dispatch* are some-

times requisite. There are cases where the most useful intelligence may be obtained, if the persons possessing it can be relieved from apprehension of discovery. Those apprehensions will operate on those persons whether they are actuated by mercenary or friendly motives, and there doubtless are many of both descriptions, who would rely on the secrecy of the president, but who would not confide in that of the senate, and still less in that of a large popular assembly. The convention have done well therefore in so disposing of the power of making treaties, that although the president must in forming them act by the advice and consent of the senate, *yet he will be able to manage the business of intelligence in such manner as prudence may suggest.*

Federalist No. 64 (J. Cooke, ed. 1961) (emphasis in final sentence added).

and secrecy both before and after the enactment of the Constitution.

Our nation's earliest intelligence activities were carried out by the Committee of Secret Correspondence of the Continental Congress. The Continental Congress created the Committee on 29 November 1775 to "correspond with our friends in Great Britain, Ireland and other parts of the world," and Congress resolved to provide for expenses incurred by the Committee in sending "agents" for this purpose.[71] In carrying out these duties the Committee placed great importance upon secrecy. In reference to information from its agent Arthur Lee, describing French plans to send arms and ammunition to the Continental Army, the Committee stated: "Considering the nature and importance of it, we agree in opinion, that it is our indispensible duty to keep it a secret, even from Congress . . . . We find by fatal experience, the Congress consists of too many members to keep secrets."[72]

The Committee exercised broad discretionary power to conduct intelligence activities independent of the Continental Congress and to safeguard the secrecy of matters pertaining to its agents, though Congress asserted greater direct control following the Declaration of Independence.[73] It is especially remarkable that the Committee was in a position to insist upon secrecy even against Congress, which functioned both as the legislative and the executive power at this time and exercised control over foreign affairs.

The importance of total secrecy in intelligence matters was appreciated in this era at the highest levels. In a letter of 26 July 1777 issuing orders for an intelligence mission, General Washington wrote to Colonel Elias Dayton: "The necessity of procuring good Intelligence, is apparent and need not be further urged. All that remains for me to add is, that you keep the whole matter as secret as possible. For upon secrecy, success depends in most Enterprises of the kind, and for want of it, they are generally defeated . . . ."[74]

As commander-in-chief of the colonial armies, Washington made full provision for intelligence activities and for proper funding. The details of Washington's planning in this regard are highlighted by a letter to Washington from financier Robert Morris, member of the Committee of Secret Correspondence, dated 21 January 1783, in which Morris stated that

I will give directions to the Paymaster General always to keep some money in the hands of his deputy, to answer your drafts for contingencies and secret service. *I have, as you will see, taken methods to put the deputy in cash,* and then your excellency will be relieved from any further care than the due application. I am, however, to pray, for the sake of regularity in accounts, that your excellency, in the warrants, would be so kind as to specify the particular service when on the contingent account, *and draw in favor of one of your family on account of secret services,* mentioning that it is for secret service. I shall direct Mr. Swanwick to endorse the bills on you in favor of Mr. Adams to the Paymaster General,

---

**71.** *See* 3 Journals of the Continental Congress 392 (1905).

**72.** American Archives, Fifth Series, vol. II, at 818 19 (P. Force, ed. 1851) (statement of Committee members Benjamin Franklin and Robert Morris, concurred in by Richard Henry Lee and William Hooper).

**73.** *See* H. Wriston, Executive Agents in American Foreign Relations 3–15 (1929). For example, when the Continental Congress instructed the Committee on 10 May 1776 to "lay their proceedings before Congress," it authorized the

Committee to withhold "the names of the persons they have employed or with whom they have corresponded." 4 Journals of the Continental Congress 345 (1906).

**74.** 8 The Writings of George Washington 478–79 (J. Fitzpatrick, ed. 1933). *See also Laird v. Tatum,* 408 U.S. 1, 6, 92 S.Ct. 2318, 2322, 33 L.Ed.2d 154 (1972) ("As Chief Justice John Marshall said of Washington, 'A general must be governed by his intelligence and must regulate his measures by his information. . . .' ") (quoting *Tatum v. Laird,* 444 F.2d 947, 952–53 (D.C.Cir.1971)).

whose deputy will receive from your excellency the amount.[75]

It is significant that this letter indicates first, the provision of a cash account before the particular necessities could be specified, and second a practice of drawing the funds in favor of Washington's family, apparently to conceal the ultimate recipient of those funds. Rather than viewing such arrangements as devious or criminal, it is clear that our highest officials in the War for Independence viewed them as entirely proper and moreover essential to the success of their enterprise.

When a new governmental structure came into operation in 1789 under the Constitution, secret funding for foreign intelligence activities quickly became institutionalized in the form of a "contingent fund" or "secret service fund" at the disposal of the President. The initial impetus for this fund can be found in President Washington's address to both Houses of Congress on 8 January 1790, the precursor to the "State of the Union" message, in which he requested "a competent fund designated for defraying the expenses incident to the conduct of our foreign affairs." [76] The first step in the creation of such a fund occurred in July of that year, when Congress appropriated funds for "persons to serve the United States in foreign parts." [77] In this appropriation act Congress required of the President a regular statement and account of the expenditures, but made allowance for "such expenditures as he may think it advisable not to specify." [78]

Three years later Congress re-enacted the statute, with altered language that permitted the President to make secret expenditures without specification, by making a certificate or having the Secretary of State make a certificate for the amount of the expenditure, such certificate to be deemed a "sufficient voucher" for the sum or sums expended.[79] This provision enabled President Washington and his successors to preserve strict secrecy for expenditures related to foreign intelligence and negotiations. Throughout subsequent years this fund continued in effect without, to our knowledge, any challenge based on the Statement and Account Clause.

In 1811 Madison himself made use of a special secret funding provision from Congress for contingency plans to take possession of parts of Spanish Florida. In response to a confidential message from President Madison, Congress passed a secret act appropriating $100,000 for such expenses as the President might deem necessary for obtaining possession.[80] Though approved on 15 January 1811, this act was not published until 1818.[81]

The establishment of these secret funding practices so soon after the Constitutional Convention indicates a contemporaneous understanding that the Framers of Clause 7 did not intend it to require disclosure of expenditures for secret military and foreign diplomacy matters. It is difficult to imagine stronger contemporaneous evidence of the Framers' intent, when one considers that the contingent fund was initially requested by President Washington, who presided over the Constitutional Convention in 1787, and that a further secret funding measure was enacted under Madison, who in his earlier role as "Father of the Constitution" [82] had introduced the "from time to time" amendment.

The contingent fund remained in continuous use by the President throughout the nineteenth century and up to the creation

**75.** 6 U.S. Dep't of State, Diplomatic Correspondence of the American Revolution 428 (F. Wharton, ed. 1889) (emphasis added).

**76.** See 1 Annals of Congress 969–70 (1834).

**77.** Act of 1 July 1790, 1 Stat. 128 (1790).

**78.** Id. at 129.

**79.** Act of 9 Feb. 1793, 1 Stat. 299, 300 (1793).

**80.** See D. Miller, Secret Statutes of the United States 6 (1918) (quoting statute enacted 15 January 1811).

**81.** See 3 Stat. 471 (1811) (printed immediately following acts approved on 20 April 1818).

**82.** See, e. g., I. Brant, James Madison, Father of the Constitution, 1787–1800 (1950).

of the CIA in the mid-twentieth century. Several quotations from American statesmen of the nineteenth century suffice to summarize for our purposes the nature of the contingent fund and its longstanding acceptance within our constitutional structure. During a debate on 25 February 1831 concerning a treaty between the United States and Turkey, Senator John Forsyth stated:

[T]he experience of the confederation having shown the necessity of secret confidential agencies in foreign countries, very early in the progress of the Federal Government, a fund was set apart, to be expended at the discretion of the President of the United States on his responsibility only, called the contingent fund of foreign intercourse. . . . But on what ground does the gentleman narrow down the use of this contingent fund? It was given for all purposes to which a secret service fund should or could be applied for the public benefit. For spies, if the gentlemen [*sic*] pleases; for persons sent publicly and secretly to search for important information, political or commercial; for agents to carry confidential instructions, written or verbal, to our foreign ministers, where secrecy was the element of success; for agents to feel the pulse of foreign Governments . . . .. Such uses have been frequently made of this fund: indeed, the propriety of thus using it is now, for the first time, doubted.[83]

A statement of President Tyler in 1844 further clarifies the common understanding during the first half of the nineteenth century concerning presidential use and congressional authorization of the contingent fund. Upon a Senate inquiry concerning the employment of a Mr. Duff Green to acquire information in England related to the matter of the Oregon Territory, President Tyler replied to the Senate:

Although the contingent fund for foreign intercourse has for all time been placed at the disposal of the President, to be expended for the purposes contemplated by the fund *without any requisition upon him for a disclosure of the names of persons employed by him, the objects of their employment, or the amount paid to any particular person*, and although any such disclosures might in many cases disappoint the objects contemplated by the appropriation of that fund, yet in this particular instance I feel no desire to withhold the fact that Mr. Duff Green was employed by the Executive to collect such information, from private or other sources, as was deemed important to assist the Executive in undertaking a negotiation then contemplated, but afterwards abandoned, upon an important subject, and that there was paid to him through the hands of the Secretary of State $1,000, in full for all such service.[84]

President Polk, taking an even firmer stance based on this tradition than did Tyler, refused to accede to the request of the House of Representatives for disclosure of expenditures from the contingent fund. On 20 April 1846 he gave his reply as follows:

The expenditures for this confidential character, it is believed, were never before sought to be made public, and I should greatly apprehend the consequences of establishing a precedent which would render such disclosures hereafter inevitable. . . .

The experience of every nation on earth has demonstrated that emergencies may arise in which it becomes absolutely necessary for the public safety or the public good to make expenditures the object of which would be defeated by publicity.[85]

These statements of Presidents Polk and Tyler, far from being exceptional or abusive, appear to typify the attitude of our government toward secret expenditures for

---

83. Cong.Deb. 295 (1831) (Forsyth later served as Secretary of State under Presidents Jackson and Van Buren).

84. 4 J. Richardson, Messages and Papers of the Presidents 328 (1897) (emphasis added).

85. *Id.* at 434, 435.

foreign intelligence operations, beginning with the Committee of Correspondence during the War for Independence, and running consistently through the Constitutional Convention and the era following it. In the debates on these issues no one expressed a belief that disclosure of intelligence-related expenditures might be constitutionally required. At most disclosure might come about if Congress decided that it should; but even when Congress demanded such information, our early Presidents were often able to raise a claim of privilege for sensitive Executive documents.[86]

Our survey of historical evidence persuades us that secrecy of intelligence efforts, including expenditures, was a practice of General Washington during the War for Independence; that the Framers, by adopting the Statement and Account Clause in Madison's amended form, intended Congress and the President to have discretion to maintain the secrecy of intelligence expenditures; that from the time of the first Congress our government in fact provided for such secrecy pursuant to statute; and that the contingency fund for secret expenditures continued in use through the next century for purposes of foreign intelligence. Those who voiced criticism toward the practice of secret expenditures, such as Mason and Henry, prove to be a dissenting minority whose opinions contrast clearly with the prevailing view of the Framers and also with the prevailing practice of our government during the late eighteenth and nineteenth centuries.[87]

## C.

In light of this historical evidence, we can see that when Congress enacted the Central Intelligence Agency Act of 1949,[88] creating the CIA, it merely continued a longstanding

practice of secret expenditures for foreign intelligence matters. Although some particulars were changed, the structure for maintaining fiscal secrecy remained essentially the same. For example, under earlier practice the aggregate amount spent on foreign intelligence was concealed by inclusion in the overall contingent fund appropriation, which provided for considerably more activities than just foreign intelligence. Under the current practice with the CIA, subcommittees of the House and Senate Appropriations Committees review CIA budget requests in executive session. That level of Agency funding approved by the subcommittees is included in the appropriations of other agencies, upon which the full House and Senate vote. Funds thus approved are then transferred from various agencies to the CIA pursuant to section 403f of Title 50.

Along with secrecy for the entire CIA budget, Congress has provided for secrecy of individual CIA expenditure items by means of statutes, including those at issue here, sections 403(d)(3) and 403g of Title 50. Section 8(b) of the CIA Act protects the secrecy of expenditures by means of the following provision:

> The sums made available to the Agency may be expended without regard to the provisions of law and regulations relating to the expenditure of Government funds; and for objects of a confidential, extraordinary, or emergency nature, such expenditures to be accounted for solely on the certificate of the Director and every such certificate shall be deemed a sufficient voucher for the amount therein certified.[89]

This provision is similar to secrecy provisions from our nation's early history, and to

---

86. *See Nixon v. Sirica*, 487 F.2d 700, 778–80 (D.C.Cir.1973) (Wilkey, J., dissenting).

87. Appellant cites two commentators for the proposition that it is unconstitutional for Congress to allow the CIA to avoid public accounting for its expenditures. *See* L. Tribe, American Constitutional Law 166 n.15 (1978); Note, *The CIA's Secret Funding and the Constitution* 84 Yale L.J. 608 (1975). We note, however,

that Professor Tribe rests on a bare assertion without discussing the relevant historical evidence, while the student note overlooks much of the evidence discussed above.

88. Central Intelligence Agency Act of 1949, Pub.L. No. 81–110, 63 Stat. 208 (1949).

89. 50 U.S.C. § 403j(b) (1976).

secrecy provisions for other agencies for which Congress has found a need for fiscal secrecy, for example, the Federal Bureau of Investigation [90] and the Nuclear Regulatory Commission.[91] The similarity of the CIA Act to the early contingent fund practice is illustrated by a comparison of the above-quoted language with that of the first secret fund statutory provision, as re-enacted and revised in 1793. The 1793 statute provided that secret expenditures were to be accounted for merely by a certificate from the Secretary of State, such certificate to be deemed a "sufficient voucher." [92] The CIA Act follows the same procedure, with the CIA Director performing the role formerly given the Secretary of State.

The same correspondence with traditional practice is seen in sections 403(d)(3) and 403g of Title 50. Both sections protect secrecy for expenditures related to foreign intelligence activities, of the sort for which Presidents Tyler and Polk demanded secrecy, and for which James Madison and a majority of the Framers provided discretionary secrecy in the "from time to time" amendment to the Statement and Account Clause.

### D.

We must conclude from the constitutional debates, from the apparent contemporaneous understanding of what the Framers of Clause 7 intended, and from the continuous practice dating from the early years of the Republic, that the Statement and Account Clause does not create a judicially enforceable standard for the required disclosure of expenditures for intelligence activities. On the contrary, it appears that the Framers of this clause intended Congress and the Executive to have discretion to decide whether, when, and in what detail intelligence expenditures should be disclosed to the public.

Since the decision to disclose materials of this nature is committed to a coordinate branch of the government, it is a nonjusticiable political question.[93] Courts therefore have no jurisdiction to decide whether, when, and in what detail intelligence expenditures must be disclosed.

This conclusion has already been suggested by the Supreme Court in dictum to its *Richardson* opinion. As to the intent of the Framers, the Court observed that the genesis of Clause 7 "suggests that it was intended to permit some degree of secrecy of governmental operations." [94] Touching on the justiciability question, the Court doubted whether such "general directives to the Congress and Executive" were intended to be enforced by suit of a citizen.[95] Although the Court did not decide what precisely was meant by a "regular Statement and Account," it did say that "it is clear that Congress has plenary power to exact any reporting and accounting it considers appropriate in the public interest." [96]

In a separate case our court has similarly adopted the view that Congress has full discretion to define the appropriations process and concomitant reporting requirements.[97] Our more detailed analysis of historical evidence in the present case amply confirms that the Framers of the Clause intended it to leave discretion in Congress and the Executive to define reporting requirements for foreign intelligence operations and related expenditures.

### E.

That Congress has discretion to maintain secrecy for the intelligence expenditures involved in the present case is further evident from the detailed and particularized nature of these expenditure items. The earliest statements and accounts of public expendi-

---

**90.** *See* 28 U.S.C. § 537 (1976).

**91.** *See* 42 U.S.C. § 2017(b) (1976).

**92.** *See* p. 158 *supra.*

**93.** *See Baker v. Carr,* 369 U.S. 186, 211, 217, 82 S.Ct. 691, 706, 710, 7 L.Ed.2d 663 (1962).

**94.** 418 U.S. at 178 n.11, 94 S.Ct. at 2947 n.11.

**95.** *Id.*

**96.** *Id.*

**97.** *See Harrington v. Bush,* 553 F.2d 190, 194–95 & n.7 (D.C.Cir.1977).

tures were not more specific than each "head of appropriation," [98] and present day statements of budget and expenditure figures are similarly made according to category rather than individual detailed items.[99] We have already cited expressions of concern at the Constitutional Convention that extremely detailed accounting would be "impracticable." [100] To require a public accounting of the specific fee paid to an individual attorney would invade the area of discretion that the Framers allowed to Congress on this point.

Moreover, in light of the CIA deposition and affidavits submitted in this case, it is clear that particular expenditure items for specific covert operations are among the most sensitive of CIA budget items; their disclosure could lead to the uncovering of covert operations themselves. The grave harm that could follow from such detailed disclosures of intelligence expenditures confirms the wisdom of the Framers of Clause 7 in endorsing the legislative discretion inherent in the "from time to time" language proposed by Madison. It is typical of their foresight and prudence that the Framers did not create a disclosure provision so inflexible that it might in the future eviscerate the secret military and diplomatic functions that are often essential to our nation's strength and survival.

In light of our analysis we must hold that Congress and the President have discretion, not reviewable by the courts, to require secrecy for expenditures of the type involved in this case. We therefore uphold the constitutional authority of Congress to protect the secrecy of the expenditures here in question by means of such statutes as sections 403(d)(3) and 403g of Title 50. We so hold as a ground additional and alternative to our holding that appellant lacks standing.

The decision before is therefore *Affirmed.*

---

**98.** 2 Annals of Congress 302 (1792).

**99.** An example of current practice is found in the Office of Management and Budget's annually published federal budget. *See, e. g.,* OMB, The Budget of the United States Government, Appendix, Fiscal Year 1980 (1979). *See also United States v. State Bridge Comm'n,* 109

F.Supp. 690, 694 (E.D.Mich.1953) ("Congress is not required to set out with particularity each item in an appropriation as a requisite to validity").

**100.** *See* pp. 22 23 *supra.*