**George CANNING, Plaintiff**

v.

**U.S. DEPARTMENT OF JUSTICE, Defendant.**

**Civ. A. No. 92–0503 (CRR).**

United States District Court,
District of Columbia.

March 31, 1994.

As Amended May 13, 1994.

James H. Lesar, Washington, DC, for plaintiff.

Robert L. Shapiro, Asst. U.S. Atty., J. Ramsey Johnson, U.S. Atty., and John D. Bates, Asst. U.S. Atty., for defendant.

### MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

Before the Court in the above-captioned Freedom of Information Act ("FOIA") case are Defendant's Motion for Summary Judgment ("Defendant's Motion"); Defendant's Motion for Leave to Submit a Classified In Camera Declaration; a Motion for an Order Reinstating Count II of the Complaint and Mary Jane Freeman as Co–Plaintiff; the Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment and in Support of Motions (1) To Reinstate Mary Jane Freeman as Co–Plaintiff, and (2) To Reinstate Count II of the Complaint ("Plaintiff's Opposition"); the Defendant's Reply on its Motion for Summary Judgment and for Leave to Submit a Classified Declaration, and Opposition to Mary Jane Freeman's Motion to Reinstate Count II of the Complaint ("Defendant's Reply"); and Plaintiff's Opposition to Defendant's Motion for Leave to Submit a Classified In Camera Declaration.

Based upon consideration of all of the foregoing submissions, the applicable law, and the entire record herein, the Court shall grant the Defendant's Motion for Summary Judgment. The Motion for Leave to Submit a Classified In Camera Declaration and the Motion for an Order Reinstating Count II of the Complaint and Mary Jane Freeman as Co–Plaintiff shall both be denied.

### BACKGROUND

The Plaintiff in this action, George Canning ("Canning"), is seeking access to docu-

ments contained within the FBI headquarters pertaining to Jacques Cheminade ("Cheminade"), pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. In support of his claims, the Plaintiff has provided the Court with a fair amount of background information concerning Mr. Cheminade in order to place these issues in an appropriate context.

According to the Plaintiff, Cheminade is a French citizen and long-time associate of U.S. politician Lyndon H. LaRouche ("LaRouche"). Plaintiff Canning further asserts that Cheminade was employed as the French Commercial Counselor to the United States from 1972 to 1977 and that it was during this assignment that he met and began collaborating with Mr. LaRouche on "subjects of political and strategic interest to them both." *See* Plaintiff's Opposition at 4.

Thereafter, in 1977, Cheminade apparently returned to France where he became the Secretary General of the French political party known as the Parti Ouvrir European ("POE"). *See* Plaintiff's Opposition at 4. According to Cheminade, his return to France was motivated by a desire to devote himself "full time to political activities and the advocacy of Mr. LaRouche's ideas and policies." *See* Plaintiff's Opposition at 4, Cheminade Declaration at ¶ 10.

During the period of time from 1982 to 1984, Cheminade asserts that he was involved in arranging a number of meetings between "French government, military and political leaders, and Mr. LaRouche ... primarily on the subject of the SDI [the Strategic Defense Initiative ("SDI") ] and its European compliment, the Tactical Defense Initiative ("TDI")." *See* Plaintiff's Opposition at 4–5. Cheminade alleges that "[w]hile the President of the United States [Ronald Reagan] had adopted and announced the new strategic policy," there were at least two forces adamantly opposed to the new initiatives: "a group identified with 'Project Democracy' within the U.S. government ... and the Soviets." *Id.* at 5.

Based upon information contained within the records released from the FBI, Cheminade claims that as a result of these political activities he thus became the subject of a national security investigation conducted by the Paris Legal Attache Office of the FBI ("Paris Legat"). Cheminade questions the propriety of this investigation and alleges that the offices of the Paris FBI were being used to "poison" his efforts and those of his colleagues in France. More specifically, Cheminade claims that the recently released FBI documents reveal that:

there was either some French government connected source and/or a hostile (most likely) Israeli or Soviet source which was utilizing the offices of the Paris FBI office to poison our efforts because the majority of the documents (numbers 1–23) are from this 1983–84 period and show that the FBI opened a "national security" investigation of me at the behest of some redacted "foreign government" inquiring source. This is quite incredible not only because I do not believe the FBI has jurisdiction to investigate French citizens on French soil, but my activities were quite well-known, public and clearly not a threat to national security of any nation.

*See* Plaintiff's Opposition at 6.

Cheminade, like LaRouche, was subsequently prosecuted and convicted on financial fraud charges. Cheminade maintained his innocence, and subsequently appealed his conviction. *See* Plaintiff's Opposition at 6–7. The FOIA requests which form the basis for this lawsuit relate to requests for records concerning Mr. Cheminade kept by the FBI and the U.S. Department of State.

Procedurally, this case effectively began on September 10, 1991 when Plaintiff George Canning filed a FOIA request with the FBI, seeking access to all records which mentioned or pertained to Jacques Cheminade, dating back to 1980. Enclosed with Canning's request was a privacy waiver from Cheminade. *See* Plaintiff's Opposition at 2. On September 26, 1991, Canning received an acknowledgment letter from the FBI indicating that a search was underway in response to his request.

At its inception, this case also involved a Co-Plaintiff, Mary Jane Freeman ("Freeman"), who submitted a similar FOIA request for records pertaining to Jacques Cheminade to the Department of State ("State") on September 11, 1991. Ms. Free-

man also requested this information for records dating back to 1980, enclosing a notarized privacy waiver from Cheminade. *See* Plaintiff's Opposition at 2. In submitting her request, Ms. Freeman indicated her belief that Cheminade's name was likely to be cross-referenced in a list of 22 political organizations and news services which she attached to her letter to the Department of State. In October of 1991, Ms. Freeman was requested to submit additional information to the State Department, and she complied with this request by letter dated October 29, 1991.

As of February 28, 1992, neither Canning nor Freeman had received any further communications from the FBI or the State Department, thus prompting them to file this lawsuit. In March of 1992, Ms. Freeman was informed that one document had been located in response to a search of its Central Files and would be released in its entirety. Mr. Canning was informed that the FBI had not yet completed its search for records responsive to his request. *See* Plaintiff's Opposition at 3.

Thereafter, in the spring of 1992, the State Department filed a Motion to Dismiss and a subsequent Motion for Summary Judgment as to Count II of the Complaint which related to Ms. Freeman's FOIA request to the Department of State. On July 15, 1992, Judge Gerhard A. Gesell granted the State Department's Motion for Summary Judgment, rendering the Motion to Dismiss moot. *See* Order of July 15, 1992. This decision thus dismissed Count II of the Complaint brought by Mary Jane Freeman against the State Department.

In March of 1993, this case was transferred to the undersigned Judge. In August of 1993, after the FBI had completed its search for responsive records, the Defendant filed a Motion for Summary Judgment. The Defendant contends that its search yielded one main file and seven cross-references, of which only five pages were withheld in their entirety and the rest were released to the Plaintiff in redacted form. The Defendant further indicates that the withheld material falls within five categories of exemptions under FOIA, 5 U.S.C. § 552(b). *See* Defen-

dant's Motion at 1. The Plaintiff's Opposition, however, only challenges those withholding decisions made pursuant to Exemption (b)(1).[1]

In support of its Motion for Summary Judgment, the Defendant has submitted two Declarations: the Declaration of Michael D. Turner ("Turner Declaration") and the Declaration of Richard D. Davidson ("Davidson Declaration"). Mr. Turner is a Special Agent of the FBI, assigned in a supervisory capacity to the Freedom of Information–Privacy Acts Section ("FOIPA"), Information Management Division, at FBI Headquarters ("FBIHQ") in Washington, D.C. Mr. Davidson is a Special Agent of the FBI assigned in a supervisory capacity to the Document Classification Unit at FBIHQ. Mr. Davidson has been designated by the Attorney General of the United States as an Original Top Secret classification authority and declassification authority pursuant to Executive Order 12356, Sections 1.2 and 3.1.

The Court also notes that, in connection with the Motion for Summary Judgment, the Defendant has filed a Motion requesting Leave to File a Classified In Camera Declaration. Also before the Court is a Motion for an Order Reinstating Count II of the Complaint and Mary Jane Freeman as Co–Plaintiff. For the reasons enumerated below, the Court shall grant the Defendant's Motion for Summary Judgment and deny both of the other pending motions.

### DISCUSSION

**I. THE DEFENDANT HAS SUSTAINED ITS BURDEN OF PROOF AS TO THE EXEMPTION (b)(1) CLAIMS BECAUSE THE AGENCY'S AFFIDAVITS SHOW WITH REASONABLE SPECIFICITY THAT THE FBI HAS FOLLOWED THE APPROPRIATE CLASSIFICATION PROCEDURES AND THAT THESE CLASSIFICATION DECISIONS MEET THE CRITERIA OF 5 U.S.C. § 552(b)(1) AND EXECUTIVE ORDER 12356.**

As both parties recognize, Exemption 1 of the Freedom of Information Act, 5 U.S.C.

---

1. As such, the Court's decision deals only with those objections raised by the Plaintiff in his Opposition to the Motion for Summary Judg- ment, and the Court shall treat the Defendant's claims regarding the other exemptions as conceded by the Plaintiff.

§ 552(b)(1), provides that the mandatory disclosure provisions of the Act shall not apply to those materials which are:

(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive Order.

5 U.S.C. § 552(b)(1).

The relevant Executive Order in this instance is Executive Order 12356 ("E.O. 12356"), which governs the classification and protection of information affecting national security. E.O. 12356 provides that such "classification is appropriate when an original classification authority ... determines that its unauthorized disclosure, either by itself or in the context of other information, reasonably could be expected to cause damage to the national security." *See* Davidson Declaration at ¶ 4.

In moving for summary judgment, the FBI has argued that Exemption 1 was properly invoked in withholding certain material from disclosure pursuant to the criteria established by 5 U.S.C. § 552(b)(1) and E.O. 12356. More specifically, the Defendant argues that the classification in question meets these criteria because "the information at issue is sufficiently described and the FBI has followed the proper procedures in classifying it." *See* Motion for Summary Judgment at 3.

## STANDARD OF REVIEW

 In reviewing the FBI's determination that this material has been properly withheld, the Court is guided by the general principle that "as in all FOIA cases, the district courts are to review *de novo* all exemption claims advanced, and that the agency bears the burden of justifying its decision to withhold requested information." *See King v. United States Department of Justice,* 830 F.2d 210, 217 (D.C.Cir.1987). As such, agencies are typically permitted to meet this heavy burden by "filing affidavits describing the material withheld and the manner in which it falls within the exemption claimed." *Id.* at 217.

In the national security context, Congress has clearly instructed the courts to give "substantial weight" to agency affidavits in assessing whether the agency can sustain its burden during the required *de novo* review. As the legislative history of the act makes clear, there are valid reasons for courts to afford such agency affidavits this degree of deference:

[C]ourts must "recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of public disclosure of a particular classified record."

*See Salisbury v. United States,* 690 F.2d 966, 970 (D.C.Cir.1982) (quoting S.Rep. No. 1200, 93rd Cong., 2d Sess. 12, U.S.Code Cong. & Admin.News 1974, pp. 6267, 6290 (conference report)).

 In practice, courts have sought to respect this directive to credit agency expertise in evaluating matters of national security by focusing attention primarily on whether affidavits are sufficiently specific and by ensuring that they are not controverted by contradictory evidence or evidence of bad faith. As the D.C. Circuit stated in *Halperin v. CIA,* 629 F.2d 144 (D.C.Cir.1980):

summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.

If the agency's statements meet this standard, the court is not to conduct a detailed inquiry into whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinions of the agency. Judges, moreover, lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case.

*Halperin* at 148 (footnotes omitted).

 Under the circumstances of this case, the Court finds that the Defendant has met its burden of proof by showing with reasonable specificity why the documents or por-

tions thereof properly fall within the claimed exemption. *See Hayden v. National Security Agency/Central Security Service et al.,* 608 F.2d 1381, 1387 (D.C.Cir.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). The affidavits submitted by the FBI are neither conclusory nor overly vague, and the Court is satisfied that they provide sufficiently specific information to justify the agency's withholding decisions. *Id.* Since this information is not contradicted in the record and the Court finds no evidence of agency bad faith, the Defendant is entitled to summary judgment, without an *in camera* review of the documents. *Id.*

In challenging the Defendant's entitlement to summary judgment, the Plaintiff argues that the agency has failed to meet its burden of proof under the standards set forth for Exemption (b)(1) claims. Relying upon *King v. United States Department of Justice,* 830 F.2d 210 (D.C.Cir.1987), the Plaintiff asserts that the declaration filed by Richard D. Davidson improperly relies upon the use of a coding system and fails to sufficiently describe the content of the material withheld. According to the Plaintiff, the declaration does not adequately explain how disclosure of the material in question would harm national security, relying instead upon a "conclusory statement that such harm will result." *See* Plaintiff's Opposition at 9–10. The Court, however, is not persuaded by Plaintiff's objections.

**A. The FBI's use of a coding system in preparation of its Vaughn index is not per se improper.**

As a preliminary matter, the Court addresses the question raised by the Plaintiff regarding the FBI's use of a coding system in preparation of its *Vaughn* index. Although the Plaintiff has not directly challenged this practice *per se,* Plaintiff's Opposition implies that the FBI's use of a coding system in the production of its *Vaughn* index is somehow improper.

The FBI, however, argues that there is nothing inherently impermissible about the use of a coded approach, provided the agency groups the "withheld information into various relevant categories that are sufficiently dis-

tinct to enable the court to understand how each category of documents, if disclosed, could reasonably be expected to interfere with pending or prospective enforcement proceedings." *See* Motion for Summary Judgment at 2. The agency emphasizes that the key to such a coded approach is that the "categories be defined in such a functional manner that the court can clearly assess whether release of the withheld information could result in the alleged interference." *Id.* at 2.

■ As a matter of principle, the Court agrees with the Defendant's claim that there is nothing inherently improper about the use of a coding system. In assailing the adequacy of Defendant's coded declaration, Plaintiff's reliance is upon the case of *King v. United States Department of Justice,* 830 F.2d 210 (D.C.Cir.1987). In *King,* however, the Court of Appeals explicitly noted that "a system for categorizing Exemption 1 claims may be appropriate, particularly where the documents in question are voluminous and the same exemption applies to a large number of segments." *Id.* at 224. "Similarly, a coding system might be employed to indicate applicability of a given response to more than one segment of redacted material, so long as the information supplied remains responsive to each deleted segment without becoming categorical in tenor." *Id.* at 224.

Essentially, the Court of Appeals explained that the importance of a *Vaughn* index lies in its substance, and alternative forms are to be judged on this basis and not rejected merely for failing to conform to a particular format: "The measure of a *Vaughn* index is its descriptive accuracy, and we are willing to accept innovations in form so long, but only so long, as they contribute to that end." *King* at 225.

In the instant case, the Defendant has employed a coded approach specifically designed to facilitate the Court's review of its withholding decisions. Attached to the Motion for Summary Judgment are copies of all of the redacted documents clearly marked and identified by codes which correspond to the various FOIA exemptions the agency has invoked. *See* Exhibit A. Moreover, all of

the classified information withheld from the Plaintiff pursuant to Exemption One was "itemized, indexed, and further justified" in Appendix A, which sets forth a description of the code format, a code catalogue index, and a list which includes a "description of each serial containing national security information." *See* Davidson Declaration at 10; Appendix A. Accordingly, as explained in the Declaration of Michael D. Turner, the Court finds that the coded format was effectively utilized to "better assist the Court and the plaintiff in reviewing the information withheld within the context of the documents themselves." *See* Turner Declaration at 6.

Upon examination of the documents in question and the accompanying indices, the Court is satisfied that the format employed by the Defendant does indeed facilitate the process of meaningful review by both the Plaintiff and the Court.

**B.** *The Court finds that the declarations submitted by the agency are conducive to meaningful judicial review because they are not overly categorical in nature, but are instead narrowly tailored to reveal as much detail as possible, without disclosing information that must be kept secret in order to protect legitimate national security concerns.*

In arguing that the Defendant's coded declaration is substantively inadequate, the Plaintiff again relies upon *King v. U.S. Department of Justice*, 830 F.2d 210 (D.C.Cir. 1987). In *King*, the Court rejected the use of "categorical descriptions of redacted material coupled with categorical indication of anticipated consequences of disclosure," setting forth instead five requirements for the use of agency affidavits in support of an Exemption 1 claim:

> To support its Exemption 1 claims, the agency affidavits must, for each redacted document or portion thereof, (1) identify the document, by type and location in the body of documents requested; (2) note that Exemption 1 is claimed; (3) describe the document withheld or any redacted portion thereof, disclosing as much information as possible without thwarting the exemption's purpose; (4) explain how this

> material falls within one or more of the categories of classified information authorized by the governing executive order; and (5) explain how disclosure of the material in question would cause the requisite degree of harm to the national security.

*King* at 224. The Plaintiff asserts that the Davidson declaration is "deficient with respect to the third, fourth, and fifth requirements," arguing that "[r]ather than describing what the content of the withheld material pertains to and then explaining how its disclosure will harm national security, he [Davidson] simply makes a conclusory statement that such harm will not result." *See* Plaintiff's Opposition at 10.

The Court, however, does not agree with Plaintiff's assertion that the "FBI has employed the same kind of coded declaration which the Court of Appeals found profoundly lacking in *King*." Upon careful review of the agency's submissions in the instant case, the Court finds that the declarations provided in connection with this matter are far more narrowly tailored than the categorical explanations criticized by the Court of Appeals in *King*.

Indeed, the Court notes that this constitutes a significant distinction between the declarations provided in *King* and those at issue here. In *King*, the Court of Appeals found that the "declaration's far-ranging category definitions ... [for classifiable material] make clear that the FBI could provide subcategory descriptions of redacted material in far more detail than it has." *King* at 221–222. Similarly, the *King* court found that the declarant's "account of consequences likely to follow disclosure of the information in question is similarly deficient, presenting myriad damage possibilities for each category of classifiable information." *Id.* at 222.

In the instant case, however, the Court notes that the agency affidavits are both briefer and far more specific in terms of outlining precisely which sorts of harms are likely to flow from the disclosure of withheld material. The Court thus finds the declarations in this case to be far more conducive to substantive, meaningful review.

More specifically, the *King* court rejected the FBI's declarations upon finding that the broad based justifications for withholding portions of documents camouflaged a far more discrete set of withholding decisions. The *King* court therefore required the agency to highlight each specific decision, to the extent possible, without revealing the underlying information the agency was seeking to protect. As the *King* court explained:

> In decoding the redaction annotations, one encounters at every turn general, not particularized, response. And the generality of the declaration's subcategory description seems to result, not from cautious avoidance of revealing descriptive detail, but rather from the wide-ranging coverage of the subcategory description itself. Similarly, every account the declaration offers of consequences of disclosing material withheld assumes the form of a list whose serial alternatives reflect, not predictive uncertainty about such consequences, as much as the broad contours of the categorization scheme employed. Clearly, a series of discrete declassification decisions was necessary to prepare the King file for release, but the texture of these deliberations is everywhere effaced by the coding system employed to justify them to the court.

*King* at 223. In the instant case, the Court cannot agree with the Plaintiff that the declarations are "lacking in that specificity of description ... necessary to ensure meaningful review of an agency's claim to withhold information subject to a FOIA request." *Id.* at 223.

Indeed, the Court finds that the agency affidavits in this case are carefully tailored to comply as fully as possible with the competing concerns surrounding the need to explain a decision to withhold protected information, without simultaneously disclosing the very information the agency is seeking to protect. Unlike in *King*, the relatively brief, far narrower descriptions of withheld classified information provided here tend to suggest that the descriptions were indeed "drafted specifically for the documents contained in this case." *See* Davidson Declaration at ¶ 13. The Court thus finds the agency's explana-

tions in the instant case far more helpful than the broader, more widely applicable descriptions rejected as inadequate in *King*.

The Court is similarly satisfied that the declarant's efforts to provide as much specificity as possible are indeed reflected in the declarations provided. The Court thus credits the declarant's representations that:

> The language used to address each justification was carefully chosen and great care was taken to avoid mere recitation of the language of EO 12356. Every effort was made to use language of sufficient detail to demonstrate the propriety of Exemption One. At the same, it was incumbent upon me to ensure that the descriptions in this *public* document were not so specific as to reveal the very information that must be kept secret in order to protect the national security.

*See* Davidson Declaration at ¶ 14. As such, the Court finds that the agency has set forth, as fully as possible, the discrete bases upon which each of the relevant withholding decisions was made.

**C.** ***The FBI affidavits do show with reasonable specificity why release of the withheld information would damage current national security, and the Court thus finds that the declarations sufficiently allege the requisite logical nexus to justify withholding pursuant to Exemption (b)(1).***

■ One of the principal grounds upon which the Plaintiff challenges the FBI's explanation for its withholding decisions concerns the time frame within which the classified information remains a potential threat to national security. More specifically, the Plaintiff argues that "[i]t is not at all apparent why release of the withheld information would damage *current* national security." *See* Plaintiff's Opposition at 10. Although the Plaintiff concedes that most of the documents in question are dated 1984–1985, Canning contends that they "generally reference or incorporate the content of earlier documents which date to the early 1970s." The Plaintiff thus urges the Court to find that "[g]iven the vast changes in political and military relationships which have occurred

over the past twenty years, and particularly the past five years, it cannot be *presumed*, as Davidson has done, that damage to national security will result from the disclosure of intelligence sources and methods, intelligence activities, or foreign government information." *Id.* at 10.

The Court, however, is unpersuaded by these claims. Although the Plaintiff is correct in asserting that the presumptions in E.O. 12356 are to be construed as rebuttable rather than conclusive, and that the age of the classified information may tend to rebut the presumption that disclosure would damage current national security, the Plaintiff is not correct in concluding that the affidavits submitted by the Defendant in the instant action are deficient because they allegedly fail to address "crucial questions of whether each particular intelligence source is still alive, is still functioning as a source, has already been revealed, or can possibly be identified by places, dates, capability, or other information supplied ... years after the fact." *See* Plaintiff's Opposition at 11. To the contrary, the agency affidavits in this action are designed to address these precise concerns.

Indeed, the Davidson declaration specifically states that "[a]ll of the intelligence activities or method [sic] detailed in the withheld information are currently utilized by the FBI and are effective means to gather intelligence information." *See* Davidson Declaration at ¶ 10. Moreover, Davidson goes on to explain how disclosure of these intelligence activities and methods could reveal FBI criteria used in *current* investigations:

> The criteria utilized by the FBI in these instances to decide what actions by an individual or organization warranted the commencement of an investigation, or caused a certain activity to be given investigative attention over others, can be revealed through disclosure of these intelligence activities or methods. Much of the criteria applied and priorities assigned in these records are used in the FBI's current intelligence or counterintelligence investigations, which were conducted in accordance with the Attorney General's guidelines on FBI intelligence or counter-

intelligence investigations. The information obtained from the activities or method is very specific in nature, was provided during a specific time period, and known to very few individuals. Disclosure of the specific information describing the intelligence activities or method being withheld in this case are still used by the FBI today to gather intelligence information could reasonably be expected to cause serious damage to the national security for the following reasons: (1) Disclosure would allow hostile entities to discover the current activities or method used; (2) reveal current specific targets of the FBI's national security investigations; and (3) determine the criteria used and priorities assigned to current intelligence or counterintelligence investigations. Hostile entities could then develop countermeasures which could severely disrupt the FBI's intelligence-gathering capabilities. This would severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws.

*See* Davidson Declaration at 6–7.

Similarly, with respect to information withheld as relating to "foreign relations or foreign activities," the Davidson declaration explicitly states that the "retention of the confidential nature of this exchange is essential to ensure continued liaison with the foreign government(s), which continues at the present time." *Id.* at 7. Perhaps even more importantly, the Davidson affidavit goes on to explain that information of this type "does not lose its sensitivity with the passage of time." *Id.* at 8. As Davidson explains, the maintenance of a continued relationship with the particular foreign government in question depends in large measure on the United States' preservation of confidentiality, as much with respect to current requests for confidentiality as with respect to past promises to this effect.

Nor is the Court is persuaded by the Defendant's claims to the contrary. First, and perhaps most importantly, the Court's mandate to accord substantial weight to agency affidavits in the national security context weighs heavily against any finding that the agency has overstated the risks of disclosure.

Moreover, the Plaintiff's primary basis for asking the Court to find that the Defendant is not justified in seeking to protect this information is that the passage of time and changed political circumstances (particularly the "collapse of the Soviet Union") render it unreasonable to think that disclosure of the information in question could result in damage to the national security. Not only is the Court not prepared to second-guess the agency on matters that so clearly require agency expertise, but the Court itself is not inclined to accept the Plaintiff's contention that changes occurring within the past five years have so drastically altered international affairs as to render the FBI's instant security concerns somehow obsolete. Finally, the Court notes that most of the cases relied upon by the Plaintiff for the proposition that the passage of time tends to rebut presumptions of damage from disclosure concerned far less recent documents than those at issue in this case.

The Court thus finds that the agency has adequately sustained its burden of demonstrating, with reasonable specificity, that there is a logical nexus between disclosure of the information in question and potential damage to the national security that could reasonably be expected to result from release of the withheld material.

D. *There is no credible evidence to suggest that the FBI has withheld information to conceal illegal or improper activities or to prevent embarrassment in violation of E.O. 12356.*

■■■■ The Plaintiff also challenges the Defendant's withholding decisions on the grounds that it is a violation of E.O. 12356 to withhold information to prevent embarrassment or to conceal illegal or improper activities. Although the Plaintiff is clearly correct in asserting that information may not be withheld for these purposes, the Court finds no credible evidence that the agency's motives for its withholding decisions were improper or otherwise in violation of E.O. 12356.

Executive Order 12356 is clear in its prohibition of the classification of information for improper purposes:

In no case shall information be classified in order to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency ... or to prevent or delay the release of information that does not require protection in the interests of national security.

*Id.*, at § 1.6(a). Neither party challenges this provision as a legal matter; the dispute with respect to this issue centers around the plausibility of Plaintiff's claim that the FBI's withholding decisions run contrary to this directive.

The Plaintiff contends that records relating to an FBI investigation "on French soil, of a French citizen (Cheminade) who is a public figure in France could be deeply embarrassing to the U.S. Government." *See* Plaintiff's Opposition at 11. Citing the temporal correlation between the FBI's investigation and Cheminade's work on the SDI, Plaintiff suggests that the initiation of the FBI investigation at the request of a foreign government (such as the Soviet Union or someone tied to Project Democracy) might implicate the FBI in activities "shown to be in direct opposition to the President of the United States' publicly announced strategic military doctrine." *See* Plaintiff's Opposition at 12. The Plaintiff supports this claim by arguing that "there is strong evidence from the face of the FBI's own documents that it knew its Paris office should not be conducting an investigation of a French citizen in his own country." *Id.* at 4.

The Court, however, does not agree with Plaintiff's contention that there is "evidence in this case that strongly suggests that information has been classified to conceal illegal or improper activities, or to prevent embarrassment, in violation of E.O. 12356." *Id.* at 12–13. The Plaintiff's claims are based primarily on speculation; and what little evidence there is, tends to suggest that the FBI is *not* withholding information to conceal evidence of a potentially embarrassing investigation of Cheminade.

The Defendant argues that the Plaintiff has failed to "identify any statute, regulation or guideline the violation of which ... is

being hidden." *See* Defendant's Reply at 4. The Defendant further argues that there is no explanation as to why such an investigation, if in fact one existed, would be embarrassing to the FBI.

The Court is inclined to agree with the Defendant that the Plaintiff has offered little more than conjecture in support of his theory that the agency's withholding decisions are in violation of E.O. 12356. Moreover, the evidence that the Plaintiff does offer as proof of the agency's allegedly improper classification decisions tends to rebut the Plaintiff's allegation that the agency's withholding decisions were improperly motivated.

The Plaintiff's evidence of allegedly inappropriate classification decisions consists primarily of a series of released statements questioning the direction and objectives of FBI inquiries. From these statements, and from other redacted material, Plaintiff has formed the conclusion that "[t]he now-released documents show that the Paris Legal Attache office of the FBI ("Paris Legat") had Cheminade under investigation—a national security investigation whose file number is even classified—at the very same time as he and LaRouche were meeting with high-level government and military officials of France and other European countries." *See* Plaintiff's Opposition at 6.

Without addressing the merits of this conclusion, the Court simply notes that the FBI has in fact released sufficient information to enable the Plaintiff, and others, to at least hypothesize that such an investigation was in fact conducted. To the extent that the Plaintiff contends that release of this information would be an embarrassment to the government, the Court finds it difficult to believe that the agency's withholding decisions were motivated by a desire to improperly conceal such facts. If anything, the agency has released sufficient information to facilitate such speculation about the existence of a potentially inappropriate investigation. The Court thus finds no credible evidence that the FBI has improperly withheld information in violation of E.O. 12356.

**E.** *The agency's affidavits also support a finding that appropriate classification procedures were followed by the FBI in dealing with the documents produced in response to the Plaintiff's FOIA request.*

The Davidson declaration indicates that before considering an Exemption One claim for withholding agency records, care was taken to determine that the information contained within those records satisfied the requirements of E.O. 12356. More specifically, to ensure that information was properly classified, the affiant verified, *inter alia*, that

(a) the face of each document was marked as required and stamped with the proper classification designation; (b) each document was marked to indicate clearly which portions are classified and which portions are not classified; (c) the limitations on classification specified in E.O. 12356, Section 1.6 was adhered to; (d) the declassification policies set forth in EO 12356, Section 3.1 were followed, and (e) any reasonably segregable portions of these classified documents that did not require protection under E.O. 12356 was declassified and marked for release unless withholding was otherwise warranted under applicable law.

*See* Davidson Declaration at 3–4 (footnotes omitted). These classification determinations were then reviewed by the Department of Justice, Department Review Committee which confirmed that the classification actions complied with the relevant directives and guidelines for the classification of information pursuant to E.O. 12356. *Id.* at 4.

As such, since the Court finds that the agency employed the proper classification procedures and has shown that the material withheld logically falls within the parameters of Exemption (b)(1), the Defendant has sustained its burden of proof with respect to its Exemption (b)(1) claims. The Plaintiff has not controverted the Defendant's affidavits and Mr. Canning's claims of bad faith on the part of the agency are purely speculative and not supported by any evidence in the record. Accordingly, the Court finds that summary judgment may properly be awarded to the Defendant under the standards set forth in *King:*

a district court may award summary judgment to an agency invoking Exemption 1 only if (1) the agency affidavits describe the documents withheld and the justifications for nondisclosure in enough detail and with sufficient specificity to demonstrate that material withheld is logically within the domain of the exemption claimed, and (2) the affidavits are neither controverted by contrary record evidence nor impugned by bad faith on the part of the agency.

*King* at 217 (footnotes omitted).[2]

## II. THE DEFENDANT'S MOTION FOR LEAVE TO FILE A CLASSIFIED IN CAMERA DECLARATION SHALL BE DENIED AS UNNECESSARY IN VIEW OF THE COURT'S FINDINGS THAT THE AGENCY AFFIDAVITS ARE SUFFICIENTLY DETAILED TO ENTITLE THE DEFENDANT TO AN AWARD OF SUMMARY JUDGMENT.

 The Defendant has also filed a Motion for Leave to Submit a Classified In Camera Declaration. In response, the Plaintiff asserts that this "motion is strenuously opposed." *See* Plaintiff's Opposition at 21.

As the Court has found that the "affidavits provide specific information sufficient to place the documents within the exemption category . . . [and that] this information is not contradicted in the record, and . . . there is no evidence in the record of agency bad faith . . . [the Court thus finds that] summary judgment is appropriate without *in camera* review of the documents." *Hayden v. National Security Agency/Central Security Service et al.*, 608 F.2d 1381, 1387 (D.C.Cir.1979), *cert. denied,* 446 U.S. 937, 100

S.Ct. 2156, 64 L.Ed.2d 790 (1980). *See also PHE, Inc. v. Department of Justice*, 983 F.2d 248 (D.C.Cir.1993) (noting that in camera review is generally disfavored as it is "not a substitute" for the government's obligation to justify its withholding decisions).

## III. THE AGENCY HAS ALSO SUSTAINED ITS BURDEN OF PROOF WITH RESPECT TO THE ADEQUACY OF ITS SEARCH BY ESTABLISHING THAT A GOOD FAITH EFFORT WAS MADE TO RESPOND TO THE PLAINTIFF'S FOIA REQUEST AND BY DEMONSTRATING THAT THE METHOD EMPLOYED BY THE FBI WAS REASONABLY EXPECTED TO PRODUCE THE INFORMATION REQUESTED UNDER THE CIRCUMSTANCES OF THIS CASE.

 The Plaintiff also contends that the FBI has failed to produce all responsive documents, thus putting the adequacy of its search in doubt. *See* Plaintiff's Opposition at 23. As the Plaintiff notes, agency affidavits attesting to the search for responsive records are deemed insufficient to support a motion for summary judgment where they "do not denote which files were searched or by whom, do not reflect any systematic approach to document location, and do not provide information specific enough to enable [the requester] to challenge the procedures utilized." *Weisberg v. United States Department of Justice*, 627 F.2d 365, 371 (D.C.Cir. 1980). Upon consideration of this issue, however, the Court cannot conclude that the agency has failed to establish the adequacy of its search.

The Court further notes that the Plaintiff has not challenged the agency's disclosure on the issue of segregability (and indeed many of the deleted pages were withheld pursuant to exemptions other than (b)(1)). The Court thus finds that the agency has carefully and methodically sought to respect the principle that "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *See Schiller v. National Labor Relations Board, et al.*, 964 F.2d 1205, 1209 (D.C.Cir. 1992) (citing *Mead Data Central, Inc. v. United States Department of the Air Force*, 566 F.2d 242, 260 (1977)).

---

**2.** The Court also notes that the Defendant has adequately met its obligation to disclose reasonably segregable information. *See Krikorian v. Department of State*, 984 F.2d 461 (D.C.Cir. 1993). As the Turner Declaration reveals, the main investigative file consists of 59 pages of which 54 were released in redacted form. Of the seven cross-references, all thirteen pages were released in redacted form. With respect to the five pages which were withheld in their entirety, the Defendant has inserted deleted page sheets to reflect the number of pages denied, their location in the file, and the exemptions/reasons for the withholding.

As the D.C. Circuit has declared, it is well established that in order to prevail upon a motion for summary judgment, "an agency must demonstrate that is has conducted a 'search reasonably calculated to uncover all relevant documents.'" *Wiesberg v. United States Department of Justice,* 745 F.2d 1476, 1485. (D.C.Cir.1984). In emphasizing that the guiding principle is one of reasonableness, the Court of Appeals further noted that:

> the issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate* ... The adequacy of the search, in turn, is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case ... In demonstrating the adequacy of the search, the agency may rely upon reasonably detailed, nonconclusory affidavits submitted in good faith.

*Id.* at 1485 (citations omitted).

In the instant case, the declaration of Michael D. Turner sets forth with reasonable specificity the procedures followed by the agency in searching for records responsive to the Plaintiff's FOIA request. The Turner affidavit details the contents of the Central Records System files and the manner in which the General Indices are used to locate records concerning particular searches. *See* Turner Declaration at ¶¶ 5–6. The declaration also explains that "the decision to index files compiled for law enforcement purposes is made by the investigative FBI Agent or supervisor in the field and the supervising FBI Agent at FBIHQ." [3] *Id.* at ¶ 7.

In detailing the search made by the agency in response to the Plaintiff's FOIA request, the Turner affidavit also describes the FBI's electronic surveillance (ELSUR) index. ELSUR is used "to retrieve information on subjects whose communications have been intercepted as a result of a court ordered or warrantless (consensual) electronic surveillance conducted by the FBI since January 1, 1960." *Id.* at ¶ 8. The Turner declaration asserts that an ELSUR indices search conducted at FBIHQ in response to Plaintiff's specific request was negative.

The Turner declaration reveals that the Central Records System located at FBIHQ was also searched for responsive records. The results of this search identified records contained within one investigative main file and seven cross-references. *See* Turner Affidavit at ¶¶ 10–13.

Upon consideration of these submissions, the Court finds that the Turner affidavit demonstrates that the agency made a "good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Department of the Army,* 920 F.2d 57 (D.C.Cir. 1990).

In challenging the adequacy of the agency's search, the Plaintiff relies heavily upon the apparent existence of other documents referenced but not produced. In support of this contention, the Plaintiff argues that many of the documents released to him refer to pertinent records that were not released. Plaintiff lists approximately ten such documents, many of which he contends bear the same date and origin as documents released by the FBI to another associate of LaRouche and Cheminade, a Mr. Paul Goldstein. *See* Plaintiff's Opposition at 24–25. As Plaintiff acknowledges, however, many of the documents released to Mr. Goldstein that reference Cheminade bear captions "tagged to Mr. LaRouche's name." As such, the Plaintiff cannot contend that this is a legitimate basis for challenging the validity of the agency's search. Moreover, even to the extent that certain documents should have been located in response to Mr. Canning's search, the mere fact that they were not uncovered does not, by itself, undermine the adequacy of the agency's search. Nor does it suffice to sustain an allegation of "bad faith" on the part of the Defendant.

In the instant case, the Defendant correctly emphasizes that none of the Plaintiff's challenges to the adequacy of the agency's

---

3. The Turner affidavit also notes that the names of subjects, suspects, or victims carried in a case caption are automatically indexed.

search address the techniques or procedures utilized by the agency in attempting to locate responsive documents. *See* Defendant's Reply at 4–5. The mere fact that other responsive documents may exist is not the proper focus for judicial review of the adequacy of the agency's search. As the Defendant points out, the Plaintiff has "failed even to suggest how the FBI should have searched differently." *Id.* at 5. Accordingly, the Court finds that the agency's affidavits are sufficient to meet the Defendant's burden of proof with respect to this issue since the fact that the documents released reference other documents not produced does not preclude a finding that the search was reasonable under the circumstances of this case.

The Court further notes that the Plaintiff also makes two other claims with respect to the adequacy of the search, neither of which alters the Court's determination that the agency conducted a reasonable, good faith search in response to Mr. Canning's request.

First, the Plaintiff contends that "there are gaping periods of time in which no records have been produced." *See* Plaintiff's Opposition at 28. In support of this contention, the Plaintiff cites the Cheminade Declaration which argues that "no documents have been released which are dated in 1974 concerning me [Cheminade]."

The Plaintiff can hardly expect the Court to be surprised by this fact since the FOIA request submitted by Mr. Canning specifically asked the agency to search "for records from 1980 to the present." *See* Complaint, Exhibit A. As such, the agency's "failure" to produce documents dating back to 1974 clearly casts no doubt on the agency's credibility in asserting that it performed a good faith search.

Nor is the Court skeptical of the fact that the "last document in the 1983–84 series released to Mr. Canning is dated October 17, 1985." *See* Cheminade Declaration at ¶ 23. Although Mr. Cheminade may find it "quite incredulous that *all of a sudden* the FBI stopped its investigation," the Court has no reason to doubt the agency's good faith or the adequacy of its search on the sole basis of Mr. Cheminade's belief that, because he continued to engage in certain political activi-

ties, the FBI *must* have continued to maintain records pertaining to him. Indeed, in light of Plaintiff's other allegations which suggest that the FBI may have been "rethinking" the nature and objectives of certain matters pertaining to Cheminade, the Court notes that Plaintiff's own papers may provide a plausible explanation for this alleged "gap" in the existence of records after a certain date.

Finally, the Plaintiff's last contention with respect to the adequacy of the search is that Documents 24 and 30 refer to photographs which were not provided to the Plaintiff. Mr. Canning thus argues that either a search must be conducted to locate them or the Defendant must demonstrate why they were withheld. Upon examination of the documents in question, the Court again finds no basis to question the adequacy of the Defendant's search. The mere fact that these photographs were not released is not a sufficient basis upon which to find that the agency did not conduct a good faith, reasonable search for records pertaining to Cheminade. The Court is uncertain as to how the agency maintains photographs and the fact that they were not released to the Plaintiff does not call into question the adequacy of the FBI's entire search, especially in light of the fact that Mr. Canning's request never specifically mentioned photographs.

In short, the Court finds that, under the circumstances of this case, the agency has sustained its burden of proof in demonstrating the adequacy of its search. The Turner affidavit indicates that the FBI's Central Records System and General Indices were searched. Moreover, the Plaintiff's specific request that the ELSUR indices be searched was also honored by the Defendant. *See* Complaint, Exhibit A. The Plaintiff has raised no objections to the Defendant's search method nor proposed any alternatives to the FBI's search and the Court is thus satisfied with the representations made in the Turner Declaration as to the reasonableness of the Defendant's search. As explained above, the mere fact that the documents produced reference other documents that Plaintiff may be interested in, does not, by itself, call into question the adequacy of

**1052**

the Defendant's method. The Defendant is therefore entitled to summary judgment on this issue.[4]

## IV. THE MOTION FOR AN ORDER RE-INSTATING COUNT II OF THE COMPLAINT AND MARY JANE FREEMAN AS CO–PLAINTIFF MUST BE DENIED BECAUSE THE COURT FINDS NO BASIS UPON WHICH TO RECONSIDER THE DECISION OF JUDGE GESELL WITH RESPECT TO THIS ISSUE.

██ Finally, the Defendant also argues that Count II of the Complaint, concerning Mary Jane Freeman's FOIA request to the Department of State, be reinstated and that Ms. Freeman be reinstated as Co–Plaintiff. The Defendant has opposed this Motion.

As the Court has already noted, Judge Gesell dismissed Count II of the Complaint by Order dated July 15, 1992, after finding that the State Department had prevailed upon its Motion for Summary Judgment. At issue with respect to Ms. Freeman's claim was the adequacy of the State Department's search, as only a single document was located and released in response to her request for information concerning Mr. Cheminade. Upon consideration of this issue, Judge Gesell found that the Defendant had "met its burden and clearly established ... that it has concluded a reasonable and adequate search." *See* Order of July 15, 1992.

The Court is now asked to reconsider this issue on the grounds that the recently released documents attached to Exhibit A of the Turner Declaration demonstrate "beyond reasonable doubt that the U.S. State Department has more than the one record it located after suit was filed in this case." *See* Plaintiff's Opposition at 29.

Again, however, the Court must agree with the Defendant that there is no reason for this Court to reconsider Judge Gesell's determination that the State Department conducted an adequate search. The mere fact that the records released to Mr. Canning indicate that the State Department may have failed to

locate certain documents potentially responsive to Ms. Freeman's request is not a sufficient basis upon which to question the adequacy of the agency's search. The agency's obligation is to conduct a reasonable search and Judge Gesell determined that this obligation was met by the Department of State. Plaintiff's ability to produce evidence of isolated records that were not located by the State Department may indicate that the State Department's search was not "perfect" but this does not constitute sufficient evidence of an inadequate search and does not justify reconsideration of Judge Gesell's determination. As such, the Plaintiff's Motion to Reinstate Count II of the Complaint and to Reinstate Mary Jane Freeman as Co–Plaintiff must be denied.

### CONCLUSION

After careful consideration of the parties' submissions, the applicable law, and the entire record herein, and for all of the foregoing reasons, the Court finds that the Defendant's Motion for Summary Judgment must be granted, and that the Defendant's Motion for Leave to File a Classified In Camera Declaration and the Motion for an Order Reinstating Count II of the Complaint and Mary Jane Freeman as Co–Plaintiff must both be denied. The Court shall thus issue an Order of even date herewith consistent with the foregoing Memorandum Opinion.

### ORDER

Upon consideration of the submissions of the parties in the above-captioned case, the applicable law, the entire record herein, and for all of the reasons articulated in this Court's Memorandum Opinion issued of even date herewith, it is, by the Court, this 31st day of March, 1994,

ORDERED that the Defendant's Motion for Summary Judgment shall be, and hereby is, GRANTED; and it is

FURTHER ORDERED that the Defendant's Motion for Leave to File a Classified In Camera Declaration shall be, and hereby is, DENIED; and it is

---

4. The Plaintiff, of course, remains free to file additional FOIA requests with the agency to se- cure any other documents or photographs of which he is now aware if he so chooses.

FURTHER ORDERED that the Motion to Reinstate Count II of the Complaint and Mary Jane Freeman as Co-Plaintiff shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that the above-captioned case shall be, and hereby is, DISMISSED from the dockets of this Court; and it is

FURTHER ORDERED that any and all other pending motions shall be, and hereby are, rendered and declared MOOT.